UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLIS TOWERS WATSON PUBLIC LIMITED COMPANY and WILLIS RE INC.<br>                  Plaintiffs,<br><br>   v.<br><br>PAUL HERRIOTT,<br><br>                  Defendant. | 21-cv-00487<br><br>**Declaration of James Bradshaw In Support of Plaintiff's Motion For A Temporary Restraining Order and A Preliminary Injunction** |

1.    I, James Bradshaw, make this Declaration under penalty of perjury and submit this Declaration in support of the Motion for a Temporary Restraining Order and a Preliminary Injunction filed by Plaintiffs Willis Towers Watson Public Limited Company ("WTW") and Willis Re Inc. ("Willis Re") (collectively "Willis").[1]  This Declaration is based on my personal knowledge.

2.    I am the Chief Executive Officer for Willis Re Inc.  My office is located in New York, New York.

3.    As a leading reinsurance broker, Willis Re, among other things, secures treaty reinsurance for its clients.  Treaty casualty reinsurance is coverage purchased by primary casualty insurers to cover a block of risks held in the primary casualty insurer's book of business.  The insurance company pays an annual premium, and Willis Re, as the broker, receives a percentage of that premium.

4.    The nature of the reinsurance and brokerage business is such that client and prospective client's identities, preferences, risk tolerances and other similar information is

---

[1] Willis Re is an indirect subsidiary of WTW.

extremely valuable. Such information, which allows companies such as Willis Re to serve clients, could also be used by competitors to entice a client away from Willis Re.

5. This information provides Willis Re with a competitive advantage in providing reinsurance brokerage services at competitive pricing to its clients. Willis Re provides extensive research, information, and training in particular areas of specialty so that employees can meet the needs of its clients to develop optimal risk management solutions.

6. From May 12, 2003 to until January 21, 2021, Defendant Paul Herriott was employed by Willis Re, based in Willis Re's San Francisco, California office. Herriott reported to me from 2010 to 2021.

7. Willis Re employed Herriott as an Executive Vice President and National Sales Director. He was a member of the North American Executive committee which establishes and implements sales and client management strategies across North America. His duties also included reinsurance brokerage services for Willis Re clients in its healthcare and professional liability segments, which includes, among other things, placing reinsurance requested by insurance clients with reinsurance companies on the best terms available, advising clients on how to structure their reinsurance coverage, marketing clients' reinsurance programs to reinsurers, managing clients' reinsurance programs and helping clients process reinsurance claims.

8. Herriott was also the head of sales for Willis Re in North America, and he has managed Willis Re's sales software rollout and usage across North American branches of the online client relationship management tool that Willis Re uses for client development and ongoing care and management of clients. Herriott has managed Willis Re's sales support staffing and products (*e.g.*, the Request for Proposal) accessed by all North American branches across Willis Re. He has managed Willis Re's sales conferences, and tracked and reported on Willis Re's sales

"pipeline" across all branch offices in North America, to the Willis Re Executive Committee, and to Willis Re's Global Executive Committee.

9. Through this role, Herriott has had unique insights into Willis Re's company strategy and direction. He has participated on a weekly Willis Re executive call wherein participants discussed day-to-day management of the business units in North America. Herriott has also participated in multiple meetings each year in New York to address broader core strategies around growth, hiring, investments, sales and operations. His responsibilities at Willis Re have also included maintaining and servicing existing client relationships, managing the profitability of his book of business, and acquiring new clients

10. By virtue of his position at Willis Re, Herriott was provided with and given access to highly confidential and proprietary information, including trade secrets.

11. To ensure the success of employees like Herriott, Willis Re provided him with the resources necessary to do his job and develop and nurture these important client relationships with new, existing and potential clients including office space, marketing support, computer systems, administrative, clerical and sales support, research, travel and expense reimbursement, all of which was provided at hundreds of thousands if not millions of dollars in expense to Willis Re.

12. Herriott benefited from Willis Re's advertising, goodwill, name recognition, and promotional marketing.

13. The competitive, confidential and proprietary information gathered and generated by Willis Re through its employees has been compiled over many years at significant expense. To protect these investments, information and customer relationships from unfair competition, Willis Re requires most or all of its employees to enter into agreements that contain reasonable and narrowly tailored restrictive covenants that prohibit the use and disclosure of confidential and

proprietary information and restricts the solicitation of certain clients and prospective clients and the solicitation of employees during employment and for a reasonable period of time post-separation. Such restrictive covenants are accepted and utilized industry-wide as reasonable and necessary to prevent unfair competition, and, upon information and belief, TigerRisk Partners LLC uses similar restrictive covenants in their employment agreements.

14. These common restrictions do not prevent employees from working in the industry for other competitors. Rather, they only ensure fair competition through the protection of certain valuable account relationships and confidential information.

15. On January 6, 2021, Herriott, along with nine other Willis Re employees who are members of his team, abruptly and simultaneously resigned from Willis Re by sending notice of his resignation via email to me. A true and accurate copy of that email is annexed hereto as **Exhibit A**. Herriott's last day of employment with Willis Re was January 21, 2021, following expiration of a fifteen (15) day notice period.

16. On or about January 8, 2021, it was publicly announced in the media that Herriott would be joining TigerRisk Partners LLC, a direct competitor of Willis Re, as a reinsurance broker and part of a larger team of nine other reinsurance brokers who are also departing from Willis Re. A true and correct copy of the announcement is annexed hereto as **Exhibit B**. On or about January 22, 2021, Herriott began work at TigerRisk Partners LLC.

17. The team's annual book of business for Relevant Clients (as defined in their agreements), is in excess of $15 million dollars.

18. Willis Re is *not* trying to prevent Herriott from working for TigerRisk Partners, LLC. Rather it is only seeking to enforce the reasonable covenants Herriott agreed to in the agreements he signed.

19. As a condition of an award of extraordinary compensation offered only to select employees, on April 2, 2018, Herriott entered into an Agreement of Restrictive Covenants and Other Obligations For Employees In The United States (the "RCA") with WTW, attached as **Exhibit C**.

20. On or about April 1, 2019, and as condition of an additional award of stock, Herriott again entered into the RCA with WTW, attached as **Exhibit D**.

21. On or about April 1, 2020, and as condition of an additional award of stock, Herriott again entered into the RCA with WTW, attached as **Exhibit E**.[2]

22. The RCA provides the following with respect to Confidential Information:

> Without the Company's prior written consent, the Associate shall not directly or indirectly, at any time during or after the Associate's employment with any Employer, disclose any Confidential Information and shall use the Associate's best efforts to prevent the taking or disclosure of any Confidential Information to a Competitor, or otherwise, except as reasonably may be required to be disclosed by the Associate in the ordinary performance of his or her duties for Employer or as required by law.

23. The RCA further provides with respect to Non-Solicitation:

> [Mr. Herriott] shall not, for the Relevant Period, directly or indirectly for a Competitor or otherwise:
>
> 3.3.1. within the Relevant Area, solicit any Relevant Client or Relevant Prospect for the purposes of any Business which competes or will compete or seeks to compete with the Restricted Group;
>
> 3.3.2. within the Relevant Area, accept, perform services for, or deal with any Relevant Client or Relevant Prospect for the purposes of any Business which competes or will compete or seeks to compete with the Restricted Group;
>
> 3.3.3. solicit for employment or entice away from the Restricted Group any Key Personnel; or
>
> 3.3.4. employ or engage or endeavour to employ or engage any Key Personnel.

---

[2] The extraordinary compensation included these three awards of stock that have a current value of approximately $450,000.

24. The RCA further provides the following key definitions, among others:

"**Confidential Information**" shall mean all trade secrets and non-public information concerning the financial data, strategic business plans, and other non-public, proprietary, and confidential information of the Restricted Group. Confidential Information includes, but is not limited to, the following information: identities of Relevant Clients and Relevant Prospects; identities of companies from which any Subsidiary obtains insurance coverage for Relevant Clients and Relevant Prospects; policy terms, conditions, rates and expiration dates pertaining to Relevant Clients and Relevant Prospects; risk characteristics of Relevant Clients and Relevant Prospects; and non-public information of the Restricted Group concerning insurance markets for particular risks. Confidential Information shall not include information that is within public domain, provided that Associate was not responsible, directly or indirectly, for such information entering the public domain without the Restricted Group's consent.

"**Key Personnel**" shall mean any person who is at the date the Associate ceases to be an employee of Employer or was (i) at any time during the period of twelve (12) months prior to that date employed by the Restricted Group, (ii) an employee with whom Associate had dealings, and (iii) employed by or engaged in the Business in a managerial capacity, or was an employee with insurance, reinsurance or other technical expertise.

"**Relevant Area**" shall mean the counties, parishes, districts, municipalities, cities, metropolitan regions, localities and similar geographic and political subdivisions, within and outside of the United States of America, in which the Employer, the Company or any of its Subsidiaries has carried on Business in which the Associate has been involved or concerned or working on at any time during the period of twelve (12) months prior to the date on which the Associate ceases to be employed by Employer.

"**Relevant Client**" shall mean any person, firm or company who or which at any time during the period of twelve (12) months prior to the date on which the Associate ceases to be employed by Employer is or was a client or customer of the Employer, the Company or any of its Subsidiaries or was in the habit and/or practice of dealing under contract with the Employer, the Company or any of its Subsidiaries and with whom or which the Associate had dealings related to the Business or for whose relationship with the Employer, the Company or any of its Subsidiaries the Associate had responsibility at any time during the said period.

"**Relevant Period**" shall mean the period of twenty four (24) months following the date on which the Associate ceases to be employed by Employer.

"**Relevant Prospect**" shall mean any person, firm or company who or which at any time during the period of six (6) months prior to the date on which the Associate ceases to be employed by Employer was an active prospective client of the Employer, the Company or any of its Subsidiaries with whom or with which the Associate had dealings related to the Business (other than in a minimal and non-material way).

25. With respect to choice of law, the RCA provides:

> This [RCA] shall be governed by and construed in accordance with the laws of the state of New York, without regard to its conflicts of law principles.

26. With respect to the forum for disputes, the RCA provides:

> Any suit, action or proceeding arising out of or relating to this RCA shall only be brought in the State and Federal Courts located in the County of New York, State of New York and the Parties hereto irrevocably and unconditionally submit accordingly to the exclusive jurisdiction of such courts for the purpose of any such suit, action or proceeding. The Associate hereby irrevocably and unconditionally waives any objections he or she may now have or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this RCA in the foregoing courts. The Associate further acknowledges that for purposes of N.Y.C.P.L.R. 327(b) and N.Y. G.O.L. Section 5-1402, the value of the Plan is in excess of One Million Dollars ($1,000,000) and the Associate hereby further irrevocably and unconditionally waives any claim that any such suit, action or proceeding brought in the foregoing courts has been brought in an inconvenient forum.

27. On January 11, 2021, Willis Re's Chief Counsel, Sheri E. Bloomberg, reminded Defendant via letter of his contractual obligations to Willis under the RCA, attached as **Exhibit F.**

28. On January 14, 2021, Willis Re's Chief Counsel, Sheri E. Bloomberg, again reminded Defendant via email of his contractual obligations to Willis under the RCA, attached as **Exhibit G.**

29. On January 20, 2021, Willis Re's Chief Counsel, Sheri E. Bloomberg, again reminded Herriott via letter of his duties owed to Willis under the RCA and requested that Herriott confirm in writing by 5:00 p.m. EST on January 20, 2021 his agreement to fulfill these duties, attached as **Exhibit H.** In response, Herriott vaguely represented that he intended to comply with his "legal obligations."

30. On January 20, 2021, Willis, through its counsel, notified TigerRisk Partners via letter of the above RCA and provided a copy of the RCA, the letter and the Complaint in this action, attached as **Exhibit I.**

31. On January 21, 2021, Willis Re's Chief Counsel, Sheri E. Bloomberg, requested via letter that Herriott confirm that he will be adhering to the covenants in the RCA, attached as **Exhibit J.** At the time of making this declaration, Willis Re has not received the requested confirmation from Herriott.

32. Instead of responding to Willis Re to clarify and confirm that he will be adhering to the covenants in the RCA, and instead of petitioning this Court for relief as required by the RCA, Herriott and TigerRisk Partners, represented by the same counsel, filed a complaint on January 22, 2021 – two days after the Willis Re commenced an action before this Court – in the Superior Court of the State of California, County of San Francisco against Willis as Case No. CGC-21-589171 (the "California Action"), attached as **Exhibit K**.

33. Willis in the California Action timely filed a Notice of Removal, removing the case to the United States District Court, Northern District of California. **See Exhibit K.**

34. By filing the California Action against Willis, Herriott materially breached the RCA's Forum Selection Clause.

35. Willis in the California Action will be seeking to have that impermissible action dismissed as all disputes under the RCA must be brought in this Court and can and should be decided by the Court in this action.

36. Permitting the California Action to proceed in direct violation of the RCA will require that Willis simultaneously litigate in multiple jurisdictions claims based on the same set of underlying facts.

37. Permitting the California Action to proceed will also cause Willis significant business disruption, substantial and unnecessary costs, and will divert significant resources, including time, money and employees, away from the strategic priorities of the business.

38. Willis will be required to engage in duplicative document productions, as well as deposition testimony from many of the same Willis Re witnesses on the same subjects.

39. This will further compel Willis Re's business, client services and legal personnel to expend unnecessary time and resources on duplicative document productions, and to prepare for and provide duplicative deposition testimony.

40. The differing procedural rules in California, and the fact that the two actions can be expected to proceed to according to materially varying schedules, will significantly complicate effort to coordinate discovery and eliminate redundancies.

41. Litigating the California Action has thus far already required the expenditure of significant resources, which include the expenditure of time and money retaining outside counsel in a different jurisdiction.

42. In addition, the prospect of inconsistent rulings and adverse injunctive relief resulting from the California Action stands to impact Willis Re's customer relationships and good will with the Relevant Clients.

43. It is clear that Herriott, who utilized the resources of Willis Re to acquire multi-million dollar customer relationships, for which he was well compensated, is now trying to take those customer relationships from Willis Re to TigerRisk Partners, which will cause irreparable harm to Willis Re and which is incapable of precise calculation, and monetary damages alone are inadequate to compensate Willis Re.

44. Willis is not trying to stop Herriott from working for Tiger Risk. He is free to do so, but he cannot breach his RCA by soliciting or servicing certain customers he worked for while at Willis Re.

45. Unless injunctive relief is granted enforcing the RCA, Willis Re will suffer irreparable harm by way of loss of or damage to its client relationships, client goodwill, and client revenues; threat to office stability, morale, and procedures; and present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

46. In the absence of immediate injunctive relief, the damage to Willis Re's business and the loss of client goodwill, which Willis Re has built through the expenditure of substantial effort and expense as detailed above, would be incalculable.

47. Willis Re stands not only to lose clients and employees to a competitor, but also lose the referrals from existing clients.

48. Herriott's unlawful acts will also result in the tarnishing of Willis Re's image of dependability, stability, and client service, the loss of client confidence, the loss of talent to a competitor, and the loss of office stability and morale.

49. Only an immediate injunction can prevent the irreparable harm that Defendant will continue to cause and seek to achieve.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing Declaration is true and correct.

Dated: January 28, 2021

_____
James Bradshaw

26525918v.1