# EXHIBIT K

NICHOLAS P. FORESTIERE, ESQ. SB# 125118
JOHN A. MASON. ESQ. SB# 166996
CANDACE H. SHIRLEY, ESQ. SB# 111177
GURNEE, MASON RUSHFORD
BONOTTO & FORESTIERE LLP
2240 Douglas Boulevard, Suite 150
Roseville, California 95661
Telephone: (916) 797-3100
Facsimile: (916) 797-3131

BRYANT D. TCHIDA, ESQ. MN SB# 0314298 (Pro Hac Vice Pending)
MATTHEW P. KOSTOLNIK, ESQ. MN SB# 0310669 (Pro Hac Vice Pending)
MEGAN J. RENSLOW, ESQ. MN SB# 0399964 (Pro Hac Vice Pending)
MOSS & BARNETT
150 South Fifth Street, Suite 1200
Minneapolis, MN 55402
Telephone: (612) 877-5284
Facsimile: (612) 877-5999
Bryant.Tchida@lawmoss.com
Matt.Kostolnik@lawmoss.com
Megan.Renslow@lawmoss.com

Attorneys for Plaintiffs

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

| | |
|---|---|
| PAUL HERRIOTT, an individual and California resident, and TIGERRISK PARTNERS LLC, a Delaware limited liability company, <br><br> Plaintiffs, <br><br> vs. <br><br> WILLIS RE INC, a New York corporation AND WILLIS TOWERS WATSON PUBLIC LIMITED COMPANY, an Irish public limited company, and Does 1-50. <br><br> Defendants. | Case No.: <br><br> Assigned for all purposes to: <br> Hon. <br> Dept.: <br><br> **COMPLAINT FOR:** <br><br> 1. **DECLARATORY RELIEF;** <br> 2. **UNFAIR BUSINESS PRACTICES VIOLATION OF CAL. BUS & PROF. CODE § 17200;** <br> 3. **INJUNCTION** <br> 4. **FAILURE TO TIMELY PAY ALL FINAL WAGES** |

Plaintiffs PAUL HERRIOTT, an individual and a California resident, and TIGERRISK

PARTNERS LLC, a Delaware limited liability company, for their Complaint against Defendant

1

**COMPLAINT**

WILLIS RE INC., a New York corporation, and Defendant WILLIS TOWERS WATSON PUBLIC LIMITED COMPANY, an Irish public limited company (collectively referred to hereinafter as "Defendants"), allege as follows:

## OVERVIEW

1.     Willis Re Inc. ("Willis Re") is an affiliate of Willis Towers Watson Public Limited Company ("WTW") and is presently the third largest insurance brokerage firm in the world.  In March 2020, Aon plc (the second largest insurance broker in the world) publicly announced its intent to acquire WTW.  The merger is set to be completed and closed by mid-2021 and is the largest insurance broker merger in history.  Aon plc will be the surviving entity.  Although this merger is currently under antitrust scrutiny, if completed the merger will create an $80 billion (equity value) company, and the surviving entity will become the largest insurance and reinsurance broker in the world.

2.     If this merger is completed, industry experts project that the merged entity will eliminate thousands of jobs, primarily from WTW and its affiliates.  This merger has created significant uncertainty and concern for Willis Re employees and their customers.

3.     Further, if this merger is completed, there will be significant market consolidation, which is problematic for both brokers and their clients who may prefer not to work with Aon for a variety of reasons.

4.     Willis Employees are also concerned that, in order to clear antitrust hurdles with the U.S. Department of Justice and the European Commission, Aon is likely to divest Willis Re to another buyer.

5.     In light of the pending merger and the uncertainties surrounding it, many Willis Re brokers have sought and obtained new employment with other insurance and reinsurance brokers. Plaintiff Paul Herriott ("Herriott") is one of them.  He shares the concerns highlighted above and, in addition, is concerned about the change in corporate culture and workplace disruption that is sure to occur in a merger this large.

6.      On January 22, 2021, Herriott terminated his employment with Willis Re and joined Plaintiff TigerRisk Partners LLC ("TigerRisk"), which is a much smaller reinsurance broker compared to Willis Re and Aon.

7.      This case involves an effort by Willis Re and WTW to use their market position and unequal bargaining power to stifle lawful competition and impose post-employment restrictive covenants and New York choice of law and venue provisions against Herriott that are void, unlawful and unenforceable under California Business & Professions Code Section 16660 and Labor Code Section 925.  Willis Re and WTW have threatened litigation against and attempted to bully both Herriot and TigerRisk, including *prior* to Herriott's departure from Willis Re.  These threats have included unreasonable timelines demanding that Herriott acknowledge in less than a day and without initially providing Herriott the opportunity to seek legal counsel about such matters, that he is bound by restrictive covenants, New York choice of law and New York venue provisions that are void and invalid under California law.  Wills Re has gone so far as to file an unfounded federal lawsuit in New York before Herriott's employment with Willis Re even ended, falsely claiming that Herriott failed to respond to these threats and demands, all in a contrived and bad-faith effort to run to the New York court, rather than the appropriate California court, to avoid using California law that renders the restrictive covenants void and the New York choice of law and venue provisions unlawful.

8.      Plaintiffs, therefore, seek relief from this Court, declaring that such restrictive covenants, including their New York choice of law and venue provisions, void and unenforceable under California law, and enjoining Willis Re and WTW from prohibiting Herriott from lawfully competing, soliciting and doing business with any present, former or even prospective customer and/or client of Defendants, including but not limited to, those for whom Herriott was a broker and/or serviced while employed at Willis Re, those with whom TigerRisk had a preexisting relationship while Herriott was employed at Willis Re, and those that have approached or may approach the Plaintiffs after Herriott terminated his employment with Willis Re.

////

**PARTIES**

9.     Plaintiff Herriott is a lifelong resident of California.  He currently resides in Napa, California.

10.     Plaintiff TigerRisk is a Delaware limited liability company, which is registered to do, and is doing, business in the State of California.  TigerRisk is a reinsurance intermediary, and its members are domiciled and reside in New York, among other states.  On January 21, 2021, Herriott's employment with Willis terminated and in January 22, 2021 he became employed by TigerRisk.

11.     Defendant Willis Re is a New York corporation with its principal place of business located in New York, New York, which is registered to do, and is doing, business in the State of California with offices located at 525 Market Street, San Francisco, California. Until January 21, 2021, Willis Re employed Plaintiff Herriott as Executive Vice President of its San Francisco office. Willis Re is a reinsurance intermediary.

12.     Plaintiffs are informed and believe and thereon allege that Defendant WTW is an Irish public limited company with its principal place of business located in London, United Kingdom. According to WTW's website, it has offices located at 525 Market Street, San Francisco, California.  Willis Re is an affiliate of WTW.

13.     Plaintiffs are unaware of the true names, capacities, or basis for liability of Defendants DOES 1 through 50, inclusive, and therefore sue said Defendants by their fictitious names. Plaintiffs will amend this complaint to allege their true names, capacities, or basis for liability when the same has been ascertained.

14.     Plaintiffs are informed, believe and based thereon allege that at all times mentioned herein each of the Defendants and DOES 1-50, were the agents, representatives and/or employees of each other.  In doing the acts and or omissions alleged herein, each of the Defendants was acting in the course and scope of said representation, agency, partnership, service, employment and with the knowledge, permission and consent, whether expressed or implied, of each other and further ratified and/or authorized the acts of each other.  Each and every defendant including the DOE

named Defendants was in some way responsible for the harm that was sustained by Plaintiffs as herein alleged and or cooperated and or facilitated or contributed to the harm suffered by Plaintiffs as herein alleged.   Each and every named Defendant also knew and or should have known and/or was put on notice of the actions of each and every other named Defendant which caused harm either directly or indirectly to Plaintiffs as herein alleged and failed and refused to take any action to prevent the harm alleged herein from occurring.

## JURISDICTION AND VENUE

15.    This Court has personal jurisdiction over Willis Re and WTW because they are licensed under the laws of the State of California and/or doing business in San Francisco County, California, where the acts complained of were committed.   Both Defendants also entered into contractual agreements with Herriott, a California resident, in California, and the subject matter of this lawsuit relates to these contracts and the Defendants' respective contacts with the State of California.

16.    This Court has subject-matter jurisdiction over this action pursuant to California Code of Civil Procedure Section 410.10 and California Business and Professions Code Section 17203 in that some or all of the events alleged herein occurred within San Francisco County, and the crux of this dispute arose within San Francisco County, California.

17.    Venue is proper because Willis Re and WTW both have offices in San Francisco County, California where Herriott worked and because the events giving rise to this action occurred here.

## FACTUAL ALLEGATIONS

### Herriott's Employment

18.    Herriott became employed by Willis Re on or around May 2, 2003, and worked there until January 21, 2021.

19.    During the entirety of his employment with Willis Re, Herriott worked in its office located in San Francisco County, California.   Herriott did not work in Willis Re's New York offices. The majority of Herriott's business was conducted in California and one of his largest Willis Re

accounts was a California customer.   Within the last 10 months, Herriott has worked almost exclusively in California.

20.    During all relevant times, Herriott was a resident of California, and has had no residence in New York.

21.    Herriott entered into an Employment Agreement with Willis Re, effective May 2, 2003. The Employment Agreement states that Herriott is to be employed at Willis Re's San Francisco, California location.  The Employment Agreement also states that it "shall be governed by California law without giving effect to its conflicts of law principles."   Nowhere in the Employment Agreement are there any restrictive covenantsor New York choice of law and venue provisions, that the Defendants seek to enforce which are void and unenforceable under California law.  Attached hereto as **Exhibit A** is a true and correct copy of the Employment Agreement.

22.    Under the Employment Agreement, Herriott's compensation was set forth in his offer letter, dated April 29, 2003 (attached as Exhibit A to the Employment Agreement attached hereto as Exhibit A).  In addition to his salary, the offer letter states that Herriott is eligible to participate in Willis Re's employee benefit programs.

**Defendant Imposes Void and Unlawful Post-Termination
Restrictive Covenants on Herriott**

23.    After Herriott's initial Employment Agreement, WTW established an Equity Incentive Plan ("Plan") that for the first time after Herriott was employed for fifteen (15) years added the void and unenforceable restrictive covenants and New York choice of law and venue provisions. On or around May 7, 2018, WTW and Herriott entered into a Phantom Stock Unit Award Agreement ("2018 Phantom Stock Agreement"), which granted Phantom Stock Units pursuant to the Plan. Attached hereto as **Exhibit B** is a true and correct copy of the 2018 Phantom Stock Agreement.

24.    The 2018 Phantom Stock Agreement provides that "the Share Award Committee (the "SAC") has determined that it would be advisable and consistent with [WTW]'s long-term compensation objectives to grant an award of Phantom Stock Units provided for herein to [Herriott] as an incentive for increased efforts during [Herriott]'s employment with [WTW], its Subsidiaries

[including Herriott's employer Willis Re] (as defined in the Plan) or its Designated Associate Companies (as defined in the Plan)."

25.     Under the 2018 Phantom Stock Agreement, a Phantom Stock Unit is defined as "a conditional right to receive payment in cash based on the Fair Market Value of a Share, pursuant to the terms of the Plan and this [2018 Phantom Stock Unit Agreement] upon vesting and settlement, subject to the attainment of certain Performance Objectives and [Herriott]'s continued employment through the vesting date."  Upon vesting, Herriott would have received a payment in cash equal to the product of the number of Phantom Stock Units that vest, multiplied by the Terminal Price, which is defined as "the average of the closing prices of an Ordinary Share for the 30 trading days immediately preceding the last day of the Performance Period."  The Performance Period is a three-year period from April 2, 2018 to April 2, 2021. Payment is conditioned upon Herriott's continued employment with Willis Re.

26.     The 2018 Phantom Stock Unit Agreement contains a Restrictive Covenant Agreement ("2018 Restrictive Covenant Agreement") that Herriott was required to sign in order to receive such additional compensation for his employment by Willis Re.  The 2018 Phantom Stock Unit Agreement provides that "[i]n the event [Herriott] does not sign and return or electronically accept the Restrictive Covenant Agreement . . .the SAC may, at its sole discretion, cancel the Phantom Stock Units." Any Phantom Stock Units granted to an Associate are subject to the 2018 Restrictive Covenant Agreement. Additionally, any violation of the 2018 Restrictive Covenant Agreement constitutes Cause for termination of employment.  Attached hereto as **Exhibit C** is a true and correct copy of the 2018 Restrictive Covenant Agreement.

27.     Plaintiff Herriott executed the 2018 Phantom Stock Agreement in order to receive the compensation provided pursuant to said agreement without representation by legal counsel and without first seeking legal advice regarding the agreement.

28.     The 2018 Restrictive Covenant Agreement includes a New York choice of law (section 4.1) and New York state and federal forum selection clause (section 4.2), both of which violated California Labor Code Section 925 made applicable to Herriott's employment pursuant to

the terms of his Employment Agreement stating that California law applied to his employment with Willis Re.

29.     The 2018 Restrictive Covenant Agreement also contains non-solicitation and noncompetition provisions, which violate California Business and Professions Code Section 16600 that state:

> 3.3. The Associate shall not, for the Relevant Period, directly or indirectly for a Competitor or otherwise:
>
>> 3.3.1. within the Relevant Area, solicit any Relevant Client or Relevant Prospect for the purposes of any Business which competes or will compete or seeks to compete with the Restricted Group;
>>
>> 3.3.2. within the Relevant Area, accept, perform services for, or deal with any Relevant Client or Relevant Prospect for the purposes of any Business which competes or will compete or seeks to compete with the Restricted Group;
>>
>> 3.3.3. solicit for employment or entice away from the Restricted Group any Key Personnel; or
>>
>> 3.3.4. employ or engage or endeavor to employ or engage any Key Personnel.

30.     The Relevant Period is defined as a period of twenty-four (24) months following the date which the Associate ceases to be employed by Willis Re (section 2.13), and the Restrictive Group definition includes Herriott's employer, Willis Re (section 2.15).

31.     These non-solicitation and noncompetition provisions are an unlawful restraint of trade and business under California law, and prevent Herriott from even accepting unsolicited business from Wills Re Relevant Clients (defined in section 2.12) to not only include Willis Re existing clients, but even its former clients and its prospective clients (defined in section 2.14) that never even became clients of Willis Re.

32.     Herriott signed an additional Phantom Stock Agreement on or around May 8, 2019 ("2019 Phantom Stock Agreement"). The 2019 Phantom Stock Agreement also includes a Restrictive Covenant Agreement ("2019 Restrictive Covenant Agreement") that contains identical non-solicitation and noncompete provisions as Paragraph 18, *supra*, prohibiting Herriott from accepting or soliciting business from prior clients, among other things. The 2019 Restrictive

Covenant Agreement imposes a New York choice of law and New York state and federal forum selection clause. Herriott was again required to sign the 2019 Restrictive Covenant Agreement as a condition to receiving the benefits of the 2019 Phantom Stock Agreement.  Attached hereto as **Exhibit D** is a true and correct copy of the 2019 Restrictive Covenant Agreement.

33.    Plaintiff Herriott executed the 2019 Phantom Stock Agreement in order to receive the compensation provided pursuant to said agreement without representation by legal counsel and without first seeking legal advice regarding the agreement.

34.    Herriott signed a Performance-Based Restricted Share Unit Agreement on or around May 8, 2020 ("PRSU Agreement") without representation by legal counsel and without first seeking legal advice regarding the agreement. The PRSU Agreement also includes a Restrictive Covenant Agreement ("2020 Restrictive Covenant Agreement") that contains identical non-solicitation and noncompete provisions as Paragraph 18, *supra*, prohibiting Herriott from accepting or soliciting business from prior clients, among other things. The 2020 Restrictive Covenant Agreement imposes a New York choice of law and New York state and federal forum selection clause.  Herriott was yet again required to sign the 2020 Restrictive Covenant Agreement as a condition to receiving the benefits of the 2020 PRSU Agreement.  Attached hereto as **Exhibit E** is a true and correct copy of the 2020 Restrictive Covenant Agreement.

35.    As alleged below in further detail, Section 16600 of the California Business & Professions Code provides that "*every contract* by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." (Emphasis added.) Section 16600 therefore renders the aforementioned provisions, as well as any other similar provisions in any employment documents, between Willis Re, WTW, and Herriott illegal, void, and unenforceable under California law and public policy.   Similarly, California Labor and Employment Code Section 925 renders the New York choice of law and forum selection clauses cited above void because they (1) require Herriott to adjudicate outside of California a claim arising in California, and (2) deprive Herriott of the substantive protection of California law with respect to a controversy arising in California.

36.     Using its dominant market position and unequal bargaining power, Willis Re and WTW nonetheless forcefully seek to impose those unlawful restrictions upon Herriott, which purport to restrain Herriott from engaging in a lawful profession, trade, or business. The 2018, 2019, and 2020 Restrictive Covenant Agreements and their respective New York choice of law and venue provisions are illegal and void under California law.   The Defendants presented these agreements to Herriott on a "take it or leave it basis," and he was not represented by legal counsel in negotiating the terms of these agreements, including their New York choice of law and venue provisions.

## Herriott's Resignation from Willis Re

37.     Herriott provided written notice of his resignation to Willis Re on January 6, 2021. Pursuant to the Employment Agreement, Herriott was required to provide Willis Re with fifteen (15) calendar days' prior written notice of his resignation, which he dutifully provided. Accordingly, his termination date was January 21, 2021.

38.     On January 20, 2021, Chief Counsel for Willis Re sent a letter to Herriott, demanding confirmation on or before 5:00 p.m. EST on that *very* same day that Herriott would adhere to the following provisions:

1.     You will promptly return all of Willis Re's property;

2.     You will uphold and fulfill your obligation to preserve any and all electronically stored information and documents in your possession or under your control; and

3.     You will adhere to all of your Post-Employment Obligations and restrictive covenants, including but not limited to obligations not to, directly or indirectly, use or disclose any Confidential Information; solicit or accept business from, transact or perform any type of business carried on by Willis Re for or on behalf of certain clients or entice such clients to discontinue, in whole or in part, doing business of any type with Willis Re; solicit or accept business from, transact or perform any type of business carried on by Willis Re for or on behalf of certain prospects; or solicit or induce employees to leave to work for a competitor.

39.     The January 20, 2021 letter also stated, "If you do not confirm your agreement to all of the above in writing to me via Electronic Mail, on or before 5pm EST on January 20, 2021, Willi[s] Re Inc. will assume that you do not intend to adhere to your above-described continuing obligations to Willis Re Inc."

40.     Although Herriott responded within the unreasonably short timeframe demanded by Willis Re's Chief Counsel, he objected on the grounds that "the turn-around timing of less than 7 hours seems very tight which does not provide reasonable time to seek legal advice." Willis Re's Chief Counsel, however, continued to badger Herriott and sent another letter dated January 21, 2021, again demanding that Herriott confirm by January 25, 2021 his agreement to be bound by unenforceable restrictive covenants. Unbeknownst to Herriott at that time, Willis Re had already surreptitiously filed, but did not serve, a complaint against him in the United States District Court for the Southern District of New York, falsely alleging that Herriott failed to respond to Chief Counsel's January 20, 2021 letter (which he had).

41.     Defendants' outside counsel has also sent threatening letters to TigerRisk, including a letter dated January 20, 2021, threatening legal action against TigerRisk with respect to Herriott (and other brokers).

42.     Herriott's employment with TigerRisk commenced immediately following termination of his employment with Willis Re on January 22, 2021.

## FIRST CAUSE OF ACTION

### (Declaratory Relief)
### (All Plaintiffs against All Defendants)

43.     Plaintiffs reallege and incorporate by reference the allegations in the prior paragraphs of this Complaint.

44.     An actual controversy has arisen and now exists between the Plaintiffs and Defendants concerning their respective rights and duties under the agreements imposed on Herriott through his employment with Willis Re, including, *inter alia*, whether California law and public policy render illegal, void, and unenforceable all or part of the 2018, 2019, and 2020 Restrictive Covenants as set forth above.

45.    Plaintiffs contend that the restraints on Herriott's ability to engage in his profession via the Restrictive Covenant Agreements are legally unenforceable and void as a matter of California law, pursuant to Section 16600 of the California Business and Professions Code, which provides:

§ 16600. Void contracts

Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void.

46.    As confirmed by the enactment of Section 16600, California has a strong fundamental public policy of promoting employee mobility and protecting its citizens from oppressive contracts (such as the agreements addressed herein) imposed by employers that would restrain the ability to fairly compete in the business marketplace with a former employer. Plaintiffs further contend that Section 16600 voiding "covenant not to compete" provisions protect the well-being of California's citizens and economy by encouraging competition between a departing employee and a former employer.

47.    Further, California Labor Code Section 925 provides:

(a)    An employer shall not require an employee who primarily resides and works in California, as a condition of employment, to agree to a provision that would do either of the following:

(1)    Require the employee to adjudicate outside of California a claim arising in California;

(2)    Deprive the employee of the substantive protection of California law with respect to a controversy arising in California.

(b)    Any provision of a contract that violates subdivision (a) is voidable by the employee, and if a provision is rendered void at the request of the employee, the matter shall be adjudicated in California and California law shall govern the dispute.

(c)    In addition to injunctive relief and any other remedies available, a court may award an employee who is enforcing his or her rights under this section reasonable attorney's fees.

(d)    For purposes of this section, adjudication includes litigation and arbitration.

(e)     This section shall not apply to a contract with an employee who is in fact individually represented by legal counsel in negotiating the terms of an agreement to designate either the venue or forum in which a controversy arising from the employment contract may be adjudicated or the choice of law to be applied.

(f)     This section shall apply to a contract entered into, modified, or extended on or after January 1, 2017.

48.     Willis Re required Herriott, a lifelong California resident and employee who primarily works in California, as a condition of employment, to agree to a provision that required him to adjudicate a claim that arose in California outside of California, and deprived him of substantive protection of California law with respect to a controversy arising in California.

49.     The 2018, 2019, and 2020 Restrictive Covenant Agreements, along with the corresponding Phantom Stock Agreements and PRSU Agreement were all entered into after January 1, 2017. The Defendants designed and used the Phantom Stock Agreements and PRSU and their Restrictive Covenant Agreements as part of a deceptive scheme and wrongful business practice not only to belatedly and deceptively deprive Herriott of the protection and rights afforded to him by California law, but also to unlawfully compete with their competitors in California who are required to comply with Business and Profession Code section 16600 and Labor Code section 925. Defendants' conduct harms California consumers.

50.     Section 925 provides that choice of law and forum selection clauses in a covered agreement are voidable. Accordingly, the choice of law and forum selection provisions contained in the Restrictive Covenant Agreements are voidable and California law applies in the interpretation and enforcement of these Agreements.

51.     Even assuming *arguendo* that Section 925 does not apply (which it does), the subject "choice of law" provisions seeking to apply New York law (which upon information and belief uphold restrictive covenants against departing employees in contradiction of California law) are still illegal, void, and unenforceable as they directly conflict with the fundamental public policy set forth by the California Legislature in Section 16600. Moreover, the State of New York neither has a substantial relationship to the parties or their transaction, nor is there any reasonable basis

COMPLAINT

1   for the purported choice of New York law. Specifically, none of the subject agreements were
2   entered into in New York, the services performed under all the contracts were performed primarily
3   in California, not New York, and Herriott was employed in California, has been a resident of
4   California his entire life, and never resided in New York during his employment with Willis Re.

5      52.      Willis Re and WTW had actual knowledge that at the time of entering into the
6   subject agreements with Herriott, he was a California resident, and therefore, the Defendants
7   knew, or should have known, that California has a strong public policy, as codified in Section
8   16600, which renders void any covenant not to compete in order to promote California's public
9   policy of promoting employee mobility and free competition in the marketplace.

10     53.      Plaintiffs desire a judicial determination of their rights and duties and a judicial
11  declaration that:

12           a.   California law governs this dispute and the proper forum for adjudication of
13                this dispute is this Court;

14           b.   The following provisions are illegal, void, and unenforceable under
15                California law:

16              i.    The non-solicitation and noncompete provisions in the 2018
17                    Restrictive Covenant Agreement.

18              ii.   The non-solicitation and noncompete provisions in the 2019
19                    Restrictive Covenant Agreement.

20              iii.  The non-solicitation and noncompete provisions in the 2020
21                    Restrictive Covenant Agreement.

22              iv.   The purported New York choice of law and venue clauses in the 2018
23                    Restrictive Covenant Agreement.

24              v.    The purported New York choice of law and venue clauses in the 2019
25                    Restrictive Covenant Agreement.

26              vi.   The purported New York choice of law and venue clauses in the 2020
27                    Restrictive Covenant Agreement.

**14**
**COMPLAINT**

c.     Plaintiffs are free to lawfully compete and do business with any customer and/or client of Willis Re, including but not limited to, customers and/or clients for whom Herriott was a broker and/or serviced while employed at Willis Re, customers and/or clients with whom TigerRisk had a preexisting relationship while Herriott was employed at Willis Re, and customers and/or clients that have approached the Plaintiffs after Herriott terminated his employment with Willis Re, and that Plaintiffs are free to use client information.

54.     A judicial determination is necessary and appropriate at this time under the circumstances in order that the Plaintiffs may ascertain their legal rights and duties under Herriott's purported written employment-related agreements and specifically determine whether the Plaintiffs may, on their own behalf or on behalf of any other person or entity, properly continue to do business with and accept new business from Herriott's former clients, including but not limited to, customers or clients Herriott worked with or provided services to while employed by Willis Re.

## SECOND CAUSE OF ACTION

### (Unfair Business Practices Violation of Cal. Bus & Prof. Code § 17200)
### (All Plaintiffs against All Defendants)

55.     Plaintiffs reallege and incorporate by reference the allegations in the prior paragraphs of this Complaint.

56.     As described above, Section 16600 of the California Business & Professions Code provides that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

57.     The aforementioned provisions in the purported agreements between Herriott and Willis Re and WTW, including but not limited to the noncompete and non-solicitation provisions, confidentiality provisions, choice of law and choice of venue provisions, seek to restrain and would restrain Herriott from engaging in a lawful profession, trade, or business and are, therefore, unlawful, void and unenforceable under Section 16600, and Sections 925 and § 432.5 of the

---

15

**COMPLAINT**

California Labor Code, and therefore constitute unlawful business practices pursuant to the California Business & Professions Code Sections 17200, et seq., for which Herriott seeks and is entitled to injunctive relief pursuant to Business & Profession Code section 17203 as set forth in the Prayer for Relief.

58.     Defendants' use of and/or threats to enforce the non-competition agreements which are void under Section 16600 to prevent its employees from working in their chosen profession constitute an unlawful and unfair business practice under Business and Professions Code Section 17200.

59.     Defendants have also engaged in unfair competition as defined in California Business & Professions Code Sections 17200 by sending letters to TigerRisk to discourage its employment of Herriott and to dissuade it from conducting business with Herriott.

60.     Defendants acted with the intention to improve their competitive position by, among other things, intentionally interfering with Herriott's economic advantages and opportunities by interfering with both Herriott's existing and developing business relationships with existing and potential clients.

### THIRD CAUSE OF ACTION

**(Injunction)**
**(All Plaintiffs against All Defendants)**

61.     Plaintiffs reallege and incorporate by reference the allegations in the prior paragraphs of this Complaint.

62.     As a direct consequence of Defendants' imposition and attempts to enforce the provisions listed in Paragraph 42, Plaintiffs have suffered and will continue to suffer substantial and irreparable harm, and stand to lose significant business, customers, clients, business goodwill and referral business in an amount that cannot be readily ascertained, as well as the ability to compete freely against the Defendants for insurance and reinsurance business which Herriott has a legal right to do so under California law.

63. If Willis Re and WTW are not immediately and permanently enjoined from attempting to enforce the aforementioned provisions in the subject agreements, the Plaintiffs will continue to be irreparably harmed.

64. Moreover, Plaintiffs lack an adequate remedy at law to address the substantial and irreparable harm.

65. In addition, the Plaintiffs have a strong probability of success on the merits.

66. Accordingly, Plaintiffs seek that the court order injunctive relief, pursuant to Code of Civil Procedure section 526(a) and Business and Profession Code section 17203, as follows:

    a.    Defendants are enjoined from enforcing the following provisions:

        i.    The non-solicitation and noncompete provisions in the 2018 Restrictive Covenant Agreement.

        ii.    The non-solicitation and noncompete provisions in the 2019 Restrictive Covenant Agreement.

        iii.    The non-solicitation and noncompete provisions in the 2020 Restrictive Covenant Agreement.

        iv.    The purported New York choice of law and venue clauses in the 2018 Restrictive Covenant Agreement.

        v.    The purported New York choice of law and venue clauses in the 2019 Restrictive Covenant Agreement.

        vi.    The purported New York choice of law and venue clauses in the 2020 Restrictive Covenant Agreement.

    b.    Defendants are enjoined from prohibiting Plaintiffs from lawfully competing and doing business with any customer and/or client of Willis Re, including but not limited to, customers and/or clients for whom Herriott was a broker and/or serviced while employed at Willis Re, customers and/or clients with whom TigerRisk had a preexisting relationship while Herriott was employed at Willis Re, and customers and/or clients that have approached

the Plaintiffs after Herriott terminated his employment with Willis Re, and that Plaintiffs are free to use client information.

## FOURTH CAUSE OF ACTION

### (Failure to Timely Pay All Final Wages)

67.     Plaintiffs reallege and incorporate by reference paragraphs 1-66 as if fully incorporated herein.

68.     Prior to his resignation, Herriott was owed wages for vacation time which was unpaid as of the day of his resignation.

69.     California Labor Code §227.3, employers who provide paid vacations to its employee must pay all vested vacation pay an employee who has accrued vested vacation pay at the termination of his employment.

70.     Plaintiff is informed and believes and thereon alleges that at the time of his resignation, Plaintiff was due approximately $8,000 for unpaid vacation time and wages but Defendants did not pay out such wages at Plaintiff's termination.

71.     California Labor Code §202 provides that an employee without a written employment contract for a definite period of time who gives at least 72 hours prior notice of his or her intention to quit, and quits on the day given in the notice, must be paid all of his or her wages, including accrued vacation, at the time of quitting.

72.     As a result of Defendants' unlawful actions, Defendants are required to pay each of the Plaintiff Herriott waiting time penalties of 30 days of additional wages pursuant to Labor Code, section 203.

73.     An employee who successfully litigates a claim for unpaid wages is entitled to an award of attorney's fees and costs. (Lab. Code, § 218.5; Civil Code §3289(b).) Plaintiff is also entitled to interest at 10 percent per annum on the amounts found to be due and owing. (Lab. Code, § 218.6.)

74.     Plaintiff seeks approximately $8,000 in unpaid wages, interest thereon, together with his attorney's fees and costs.

**PRAYER FOR RELIEF**

**WHEREFORE,** the Plaintiffs respectfully request that this Court enter judgment in their favor and order on all causes of action as follows:

1.    For judicial declaration that:

    a.    California law governs this dispute and the proper forum for adjudication of this dispute is this Court.

    b.    The following provisions are illegal, void, and unenforceable under California law:

        i.    The non-solicitation and noncompete provisions in the 2018 Restrictive Covenant Agreement.

        ii.    The non-solicitation and noncompete provisions in the 2019 Restrictive Covenant Agreement.

        iii.    The non-solicitation and noncompete provisions in the 2020 Restrictive Covenant Agreement.

        iv.    The purported New York choice of law and venue clauses in the 2018 Restrictive Covenant Agreement.

        v.    The purported New York choice of law and venue clauses in the 2019 Restrictive Covenant Agreement.

        vi.    The purported New York choice of law and venue clauses in the 2020 Restrictive Covenant Agreement.

    c.    Plaintiffs are free to lawfully compete and do business with any customer and/or client of Willis Re, including but not limited to, customers and/or clients for whom Herriott was a broker and/or serviced while employed at Willis Re, customers and/or clients with whom TigerRisk had a preexisting relationship while Herriott was employed at Willis Re, and customers and/or clients that have approached the Plaintiffs after Herriott terminated his employment with Willis Re, and that Plaintiffs are free to use client information.

d.      Herriott was not employed by WTW and therefore owed no obligations to WTW.

2.      For a temporary restraining order, preliminary injunction, and permanent injunction that:

a.      Defendants are enjoined from enforcing the following provisions:

i.      The non-solicitation and noncompete provisions in the 2018 Restrictive Covenant Agreement.

ii.     The non-solicitation and noncompete provisions in the 2019 Restrictive Covenant Agreement.

iii.    The non-solicitation and noncompete provisions in the 2020 Restrictive Covenant Agreement.

iv.     The purported New York choice of law and venue clauses in the 2018 Restrictive Covenant Agreement.

v.      The purported New York choice of law and venue clauses in the 2019 Restrictive Covenant Agreement.

vi.     The purported New York choice of law and venue clauses in the 2020 Restrictive Covenant Agreement.

b.      Defendants are enjoined from prohibiting Plaintiffs from lawfully competing and doing business with any customer and/or client of Willis Re, including but not limited to, customers and/or clients for whom Herriott was a broker and/or serviced while employed at Willis Re, customers and/or clients with whom TigerRisk had a preexisting relationship while Herriott was employed at Willis Re, and customers and/or clients that have approached the Plaintiffs after Herriott terminated his employment with Willis Re, and that Plaintiffs are free to use client information.

3.      For compensatory and special damages as provided by law;

4.      For attorneys' fees as provided by contract or statute;

////

1    5.    For costs of suit as provided by law; and

2    6.    For such other and further relief as the Court may deem just and proper.

3    Dated: January 22, 2021                    GURNEE, MASON RUSHFORD
4                                               BONOTTO & FORESTIERE LLP

5
6    By _____
                                               JOHN A. MASON
7                                              NICHOLAS P. FORESTIERE
                                               CANDACE H. SHIRLEY
8                                              Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

# EXHIBIT A



## EMPLOYMENT AGREEMENT

This **EMPLOYMENT AGREEMENT** ("Agreement") is made to be effective the 2nd day of May, 2003, between **WILLIS RE, INC.** ("Employer"), and Paul D. Herriott. ("Employee").

Employer wishes to employ Employee at its San Francisco, California location (or such other location as the Employer may in the future designate), and Employee wishes to be employed by Employer.

**NOW, THEREFORE**, in consideration of the mutual covenants and promises contained herein and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. **Employment, Compensation and Benefits.** During the period of this Agreement, Employer agrees to employ Employee and to provide Employee such compensation and benefits as are set forth in the offer letter attached hereto as **Exhibit A.** Such compensation and benefits may be changed by Employer pursuant to its normal compensation and benefit review procedures or from time to time.

2. **Ownership of Business.** All business activity participated in by Employee as an employee of Employer ("Business Activity") is the sole property of Employer. Employee shall have no right to share in any commission or fee resulting from such Business Activity other than the compensation referred to in Paragraph 1, and any monies due to Employer as a result of Business Activity shall be collected on behalf of and promptly paid over to Employer.

3. **Confidential Information.** Employer agrees that it shall provide, and Employee acknowledges and agrees that, in the course of Employee's employment, Employee will receive, access to nonpublic Employer information reasonably necessary to the performance of Employee's job duties (including, but not limited to, information regarding Employer's clients and customers). Employee shall (a) execute the Confidentiality Agreement attached hereto as **Exhibit B**, and (b) use Employee's best efforts, both during the course of employment hereunder and at all times hereafter, to prevent the taking or disclosure of nonpublic information to which Employee is exposed during Employee's period of employment with Employer. Upon termination of Employee's employment hereunder, Employee shall promptly return to Employer all Employer materials, information and any other property belonging to Employer, including (but not limited to) all files, computer discs, manuals and other Employer property, as may then be in Employee's possession or control.

4. **Employee Loyalty.** Employee agrees to devote Employee's entire business time and best efforts to the furtherance of the business of Employer during the term of this Agreement.

# Willis

5.    **Term and Termination.**    This Agreement shall commence upon the effective date first set forth above and shall continue until terminated (i) by either party, with or without cause, upon fifteen calendar days prior written notice or (ii) immediately by Employer upon any willful or gross misconduct or material breach by Employee of this Agreement.    Should Employer give Employee fifteen days notice of employment termination, (i) Employee will not, thereafter, be entitled to access to the office premises of Employer and (ii) said fifteen calendar days shall be treated as two weeks' pay under any severance or termination arrangement between Employer and Employee.    This Agreement shall also terminate automatically upon the Employee's death or disability (as that term is defined in Employer's Long Term Disability Benefits Plan). Paragraphs 3 (including Exhibit B), 6 and 8 shall survive termination of this Agreement.

6.    **Mandatory Binding Arbitration.**    Except for a claim beginning with request for injunctive relief by Employer, Employer and Employee agree that any dispute arising either under this Agreement or from the employment relationship shall be resolved by arbitration, with such arbitration process to include the following:

a.    the party invoking arbitration under this Agreement shall notify the other party in writing, and such notice shall propose an arbitrator, who shall be required to complete a disclosure of interest form;

b.    each party may exercise one peremptory strike of an otherwise competent arbitrator (provided the party objecting to the proposed arbitrator proposes an alternative arbitrator). The parties shall exercise their best efforts, in good faith, to agree upon selection of a single arbitrator.  If the parties are unable to agree upon selection of a single arbitrator, they shall so notify the American Arbitration Association ("AAA") and shall request that the AAA work with the parties to select a single arbitrator pursuant to the method and manner contemplated by the AAA's National Rules for the Resolution of Employment Disputes;

c.    the arbitration shall be conducted by a single arbitrator in a manner consistent with the American Arbitration Association's National Rules for the Resolution of Employment Disputes;

d.    the arbitration shall be conducted at a location reasonably convenient to that office of the Employer at which the Employee had most recently been assigned;

e.    the arbitration, including the arbitrator's decision, shall be completed within ninety days of receipt of notice by the party other than the party invoking this Paragraph 6;

f.    the arbitrator shall have no authority to assess punitive or exemplary damages as to any dispute (i) arising out of or concerning the provisions of this Agreement or (ii) otherwise arising out of the employment relationship, except as

2

Willis

and unless such damages are expressly authorized by otherwise applicable and controlling statutes;

g.      the arbitrator's decision shall be final and binding and enforceable in any court of competent jurisdiction; and

h.      each party shall bear its own costs, including attorneys, fees, and share all costs of the arbitration equally; except however, this provision shall not (i) interfere with either party's right to seek or receive damages as may be allowed by relevant statutory law, if any, or (ii) require Employee to pay all or a portion of the arbitrator's fees if the issues submitted to arbitration primarily concern Employee allegations of unlawful discrimination in the terms and/or conditions of employment.

7.      **Representations and Warranties.**  Employee  represents  and  warrants  the following:

a.      Except as set forth in any **Exhibit C** attached hereto, Employee is not subject to (1) any oral or written agreement with any former employer, (2) or any existing order, judgment or decree involving any former employment, independent contractor or other business relationship.  Employee agrees to provide (or describe in writing, in the case of past oral agreements) any such agreement, order, judgment or decree for attachment as Exhibit C.

b.      Employee has received and read a copy of, and will at all times abide by, Willis' Code of Ethics (or any variant of such adapted for use by Employer).

Employee agrees to indemnify and hold Employer harmless against any and all losses, damages, costs and expenses (including legal fees) incurred by Employer by reason of any breach of this Paragraph 7. This indemnification provision is subject to arbitration, as provided in Paragraph 6.

8.      **Miscellaneous.**        This Agreement sets forth the entire agreement between Employer and Employee, supersedes any and all prior agreements and understandings regarding the subject matter herein, and may be modified only by a written instrument signed by both parties (and, in the case of Employer, only by a duly authorized officer). If any term of this Agreement is rendered invalid or unenforceable by judicial, legislative or administrative action, the remaining provisions hereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated.  Any notices given pursuant to this Agreement shall be sent by hand delivery, overnight courier, or first class U.S. postal service to the addresses set forth below (or, to the then current address of the party, with both parties agreeing to promptly provide the other party with written notice of any change in address).  This Agreement shall be governed by California law without giving effect to its conflicts of law principles.  The waiver by either party of any breach of this Agreement shall not operate or be construed as a waiver of that party's rights upon any

3

# Willıs

subsequent breach. This Agreement shall inure to the benefit of and be binding upon and enforceable against the heirs, legal representatives and assigns of Employee and the successors and assigns of Employer. Should Employee be transferred or reassigned from Employer to a parent, sister, or subsidiary company of Employer, this agreement shall be automatically assigned by Employer to such new employer, and Employee's acceptance of Employee's first payment of compensation from such new employer shall be deemed as Employee's acknowledgement of such assignment. Upon the commencement by the Employee of employment with any third party, during the two (2) year period following termination, the Employee shall promptly furnish such new employer with a copy of this Agreement.

**IN WITNESS WHEREOF**, the parties hereto have executed this Employment Agreement as of the date first above written.

**EMPLOYER**                                      **EMPLOYEE**

**WILLIS RE, INC.**
**88 Pine Street, 4ᵗʰ Floor**
**Wall Street Plaza**
**New York, NY 10005**

BY: _____            _____
     **Robert T. Mobyed**                    **Paul D. Herriott**
                                                 SSN: ████████████
**TITLE: Executive Vice President &**            **Address: 102 Echo Hills Court**
      **Chief Operations Officer**                        **Fairfield, CA94533**

4

**EXHIBIT A**



April 29, 2003

Telephone:    336-574-8800
Fax:          336-574-8914
Website:      www.willis.com

Paul Herriott
1102 Echo Hills Court
Fairfiled, CA 94533

Dear Paul:

This letter is to confirm in writing our offer for the position of Vice President in the San Francisco office of Willis Re Inc. As discussed, we anticipate that your first day of work will be on or before May 12, 2003. Please formally accept our offer and signify your agreement with the terms and conditions of your employment by signing and returning one copy of this letter at your earliest convenience.

Your initial salary will be $12,083.33 per month, which is equivalent to $145,000.00 on an annual basis. You will be eligible for a salary review on or about July 1, 2004, in accordance with the Company's normal salary administration procedures. In addition, you will be eligible to participate in those Company employee benefit programs which are generally made available to the Company's employees, in accordance with the normal terms and conditions of those programs. A summary of the Willis employee benefit programs will be provided for your review.

- **Bonus:** You will be eligible to receive a bonus for calendar year 2003 in an amount not less than $20,000.00 (less applicable withholding). It is understood and agreed that such bonus will be distributed during the first quarter of the calendar year 2004, provided that you are employed by Willis as such bonus distribution time. For each calendar year commencing January 1, 2004 and thereafter, as long as you remain employed with Willis Re, you will be eligible to participate in the AIP Production bonus program.

- **Vacation:** You will earn four (4) weeks of paid annual vacation accrued in accordance with the company's normal vacation accrual policy. You will begin earning vacation and sick days immediately. You will earn sixteen (16) days vacation and (2) two floating holidays for the remainder of calendar year 2003. Sick days are accrued at a rate of (1) one day per month to a maximum of ten per year. Both plans are described on the Willis Human Resources web site.

This offer is contingent upon your completing an Employment Application and passing a drug screening test, which can be arranged at a convenient location. Please contact Deborah Adams, Human Resources Manager, at 336/574-8841 to schedule an appointment for the drug screening test. The drug screen must be taken within three days of receipt of this offer, or the offer may be withdrawn.

Willis Re Inc.
5420 Millstream Road - Suite 200
P.O. Box 3000
McLeansville, NC 27301-3000



Your employment is conditioned upon your signing a standard Confidentiality Agreement and Employment Agreement. A sample copy of the agreement(s) you will be asked to sign is enclosed for your review. This document does not promise you employment for a specified period. Employees of the Company are subject to the employment-at-will doctrine, which means either you or the Company may terminate the relationship at any time.

Under the guidelines of the Immigration Reform and Control Act of 1986, the Company must request proof of identification and authorization to work. Acceptable documentation could include a current U.S. passport, social security card or birth certificates plus a state issued driver's license or ID card with a photograph. This documentation must be presented and verified on your first day of employment.

Willis has assembled some of the best professionals in the reinsurance brokerage and consulting industries. We are convinced that your experience and expertise will help us maintain and enhance our reputation. We look forward to your joining the Willis Re team.

Sincerely,

*Jon Kocourek / A. adams*

Jon Kocourek
Executive Vice President

Enclosure

Offer Accepted:

*Paul Newath*

SIGNATURE

Date: 4|30|03

*Please initial:*

Received Benefits Enrollment Guide:

Received Sample Agreements

# Willis

**EXHIBIT B**

## CONFIDENTIALITY AGREEMENT

**THIS CONFIDENTIALITY AGREEMENT**, dated as of the May 2, 2003, between **WILLIS RE INC.**, a corporation ("Employer") and **Paul D. Herriott**, an employee of the Employer ("Employee").

**NOW, THEREFORE**, Employer and Employee hereby agree as follows:

1. Employee acknowledges that all non-public information (including, but not limited to, information regarding Employer's clients and customers), owned or possessed by Employer, its affiliated, sister, subsidiary, parent and predecessor companies (collectively, "Confidential Information") constitutes a valuable, special and unique asset of the Employer's business, access to and knowledge of which are essential to the performance of Employee's duties. Given the value of this Confidential Information, Employee agrees as a condition of his/her employment that Employee shall not, during or after the period of his/her employment with the Employer, in whole or in part, disclose such Confidential Information to any third party without the consent of Employer for any reason or purpose whatsoever. In addition, Employee shall not make use of any such Confidential Information for his/her own purposes or for the benefit of any third party under any circumstances, during or after the period of Employee's employment with Employer; provided, however, that, during and after such term of employment, these restrictions shall not apply to such Confidential Information which is then in the public domain (provided that Employee was not responsible, directly or indirectly, for the fact that such secrets or information have entered the public domain without the Employer's consent).

2. Employee hereby assigns and transfers to Employer all his/her right and interest to all intellectual property (whether an invention, discovery or refinement) (including but not limited to computer programs, manuals, training materials and other proprietary compilations of information) developed or made by Employee in his/her capacity as an employee during Employee's period of employment with Employer (collectively, "Proprietary Materials"), including any such Proprietary Materials developed or made before execution of this Confidentiality Agreement. Employee acknowledges that all Proprietary Materials shall be considered as "work made for hire", and shall be considered the sole property of Employer. Employee agrees (i) to disclose promptly the existence of all Proprietary Materials to Employer, (ii) not to disclose such Proprietary Materials to any third party without the consent of Employer, and (iii) to cooperate fully in Employer's efforts to establish and protect Employer's rights to such Proprietary Materials against all other parties. Employee shall not be entitled to additional compensation for his/her role in developing or making such Proprietary Materials.

3. Employee acknowledges and agrees that monetary damages will not be an adequate remedy for a breach by Employee of any of the provisions of this Agreement and that, in the event of such a breach, irreparable injury will result to Employer, its affiliated, sister, subsidiary or parent companies and their businesses and property. Accordingly, Employee

1

# Willis

commissions, fees and revenues, proceed in equity to enjoin Employee from violating any of the provisions noted.

4.      Employee agrees that any obligations under this Confidentiality Agreement shall be independent of, and unaffected by, any other agreement binding Employee which applies to Employee's business activities during or subsequent to his/her period of employment with Employer.  This Confidentiality Agreement shall inure to the benefit of any and all of Employer's successors, assigns, parent companies, sister companies, subsidiary companies and affiliated companies.  If any term of this Agreement is rendered invalid or unenforceable by judicial, legislative or administrative action, the remaining provisions hereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated. The waiver by Employer of any breach of this Agreement shall not operate or be construed as a waiver of Employer's rights upon any subsequent breach.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year set forth above.

**EMPLOYER:**

**WILLIS RE INC.**

By: _Deborah W. Adams_

TITLE: _Vice President_

**EMPLOYEE:**

_Paul D._ _____

2

# EXHIBIT B

**WILLIS TOWERS WATSON PUBLIC LIMITED COMPANY**
**2012 EQUITY INCENTIVE PLAN, AS AMENDED AND RESTATED**

**PHANTOM STOCK UNIT AGREEMENT**

**THIS PHANTOM STOCK UNIT AWARD AGREEMENT** (this "Agreement"), is made by and between Willis Towers Watson Public Limited Company and any successor thereto (the "Company") and the individual (the "Associate") who has signed or electronically accepted this Agreement (including the Schedules attached hereto) in the manner specified in the Associate's online account with the Company's designated broker/stock plan administrator.

**WHEREAS**, the Company wishes to carry out the Plan (as hereinafter defined), the terms of which are hereby incorporated by reference and made a part of this Agreement;

**WHEREAS**, the Phantom Stock Units (as hereinafter defined) granted hereunder are intended to constitute Restricted Share Units granted pursuant to Section 7(d) of the Plan; and

**WHEREAS**, the Share Award Committee (the "SAC") has determined that it would be advisable and consistent with the Company's long-term compensation objectives to grant an award of Phantom Stock Units provided for herein to the Associate as an incentive for increased efforts during the Associate's employment with the Company, its Subsidiaries (as defined in the Plan) or its Designated Associate Companies (as defined in the Plan), and has advised the Company thereof and instructed the undersigned officer to prepare said Agreement.

**NOW, THEREFORE**, the parties hereto do hereby agree as follows:

ARTICLE I

DEFINITIONS

Defined terms used in this Agreement shall have the meaning specified in the Plan or below.  The masculine pronoun shall include the feminine and neuter, and the singular the plural, where the context so indicates.

Section 1.1 Cause

"Cause" shall have the meaning ascribed to such term or similar term (*e.g.*, "Good Cause") in the Associate's employment agreement, if any, with the Company, a Subsidiary or a Designated Associate Company, and, in the absence of an employment agreement or such definition in the employment agreement, it shall mean: (i) the Associate's continued and/or chronic failure to adequately and/or competently perform his material duties with respect to the Company or its Subsidiaries or Designated Associate Companies having been provided reasonable notice of such failure and a period of at least ten days after the Associate's receipt of such notice to cure and/or correct such performance failure, (ii) willful misconduct by the Associate in connection with the Associate's employment which is injurious to the Company or its Subsidiaries or Designated Associate Companies (willful misconduct shall be understood to include, but not be limited to, any breach of the duty of loyalty owed by the Associate to the Company or its Subsidiaries or Designated Associate Companies), (iii) conviction of any criminal act (other than minor road traffic violations not involving imprisonment), (iv) any breach of the Associate's restrictive covenants and other obligations as provided in the Associate's employment agreement (if any), or any other non-compete agreement and/or confidentiality agreement entered into between the Associate and the Company or any of its Subsidiaries or Designated Associate Companies (other than an insubstantial, inadvertent and non-recurring breach), or (v) any material violation of any

written Company policy after reasonable notice and an opportunity to cure such violation within ten (10) days after the Associate's receipt of such notice.

Section 1.2 - Grant Date

"Grant Date" shall mean the date set forth in a schedule to the Agreement or communicated to the Associate through his online account with the Company's designated broker/stock plan administrator.

Section 1.3 - Performance Objectives

"Performance Objectives"  shall mean the performance objectives that are set forth in Schedule A to this Agreement.

Section 1.4 - Performance Period

"Performance Period" shall mean April 2, 2018 – April 2, 2021.

Section 1.5 - Phantom Stock Unit

"Phantom Stock Unit" shall mean a conditional right to receive a payment in cash based on the Fair Market Value of a Share, pursuant to the terms of the Plan and this Agreement upon vesting and settlement, subject to the attainment of certain Performance Objectives and the Associate's continued employment through the Vesting Date.

Section 1.6 - Plan

"Plan" shall mean the Willis Towers Watson Public Limited Company 2012 Equity Incentive Plan, as amended from time to time.

Section 1.7 - Retirement

"Retirement" shall mean the Associate's Termination of Service after having attained age 55 with at least 10 years of service with the Company or a Designated Associate Company or after having attained age 65 with at least 5 years of service with the Company or a Designated Associate Company .

Section 1.8 - Share

"Share" shall mean an Ordinary Share of the Company, $0.00030465 per Share, which may be authorized but unissued.

Section 1.9 - Termination Date

Unless otherwise determined by the SAC, in its sole discretion, the "Termination Date" shall mean the later of (i) the last day of the Associate's active employment with the Company or its Subsidiaries or Designated Associate Companies or (ii) the last day of any notice period or garden leave, as provided for under the Associate's employment agreement or local law; provided, however, that in the case of United States taxpayers, the termination date shall mean a date that will allow the Phantom Stock Units to comply with Section 409A of the Code.

Section 1.10 - Vesting Date

"Vesting Date" shall mean April 2, 2021.

## ARTICLE II

### GRANT OF PHANTOM STOCK UNITS

Section 2.1 - Grant of Phantom Stock Units

Subject to the terms and conditions of the Plan and the additional terms and conditions set forth in this Agreement including any country-specific provisions set forth in Schedule B to this Agreement and in the Restrictive Covenants and Other Obligations Agreement that is attached hereto as Schedule C to the Agreement (the "Restrictive Covenants Agreement"), the Company hereby grants to the Associate the number of Phantom Stock Units specified in a schedule to the Agreement or as stated in the Associate's online account with the Company's designated broker/stock plan administrator (the "Number of Granted Units"), subject to the attainment of the Performance Objectives and service vesting conditions. The Associate agrees that the grant of Phantom Stock Units pursuant to this Agreement is sufficient consideration for the Associate entering into the Restrictive Covenants Agreement.

Section 2.2 - Employment or Service Rights

Subject to the terms of the Restrictive Covenants Agreement, where applicable, the rights and obligations of the Associate under the terms of his office or employment with the Company or any Subsidiary or Designated Associate Company shall not be affected by his participation in the Plan or any right which he may have to participate in it. The Phantom Stock Units and the Associate's participation in the Plan will not be interpreted to form an employment agreement or service contract with the Company or any Subsidiary or a Designated Associate Company and the terms of any separate employment agreement to which the Associate is a party shall remain in effect and will control to the extent that there are any inconsistencies with this Agreement. The Associate hereby waives any and all rights to compensation or damages in consequence of the Termination of Service for any reason whatsoever insofar as those rights arise or may arise from his ceasing to have rights under or be entitled to earn or vest in his Phantom Stock Units as a result of such Termination of Service. If, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by participating in the Plan, the Associate shall be deemed irrevocably to have agreed not to pursue such claim and agrees to execute any and all documents necessary to request dismissal or withdrawal of such claims.

Section 2.3 - Adjustments in Phantom Stock Units Pursuant to Certain Capitalization Events.

In the event of any capitalization event described in Section 12 of the Plan, the SAC, shall adjust, as it deems, in its sole discretion and without liability to any person, to be equitable (i) the Number of Granted Units and (ii) the terms and conditions of the Phantom Stock Units (including without limitation, any applicable Performance Objectives with respect thereto). Any such adjustment or determination made by the SAC shall be final and binding upon the Associate, the Company and all other interested persons.

Section 2.4 - Tax Withholding

The Associate acknowledges that, regardless of any action taken by the Company (or, if different, the Designated Associate Company employing the Associate (the "Employer"), the ultimate liability for all Tax-Related Items, is and remains the Associate's responsibility and may exceed the amount actually withheld by the Company or the Employer. The Associate further acknowledges that the Company and/or the Employer (1) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Phantom Stock Units, including, but not limited to, the grant, vesting or settlement of the Phantom Stock Units and (2) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the Phantom Stock Units to reduce or eliminate the

3

Associate's liability for Tax-Related Items or achieve any particular tax result.  Further, if the Associate is subject to Tax-Related Items in more than one jurisdiction, the Associate acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

Prior to any relevant taxable or tax withholding event, as applicable, Associate agrees to make adequate arrangements satisfactory to the Company and/or the Employer to satisfy all Tax-Related Items.

In this regard, unless otherwise prohibited by applicable laws, the Associate authorizes the Company and/or the Employer, or their respective agents, at their discretion, to satisfy the obligations with regard to all Tax-Related Items by withholding amounts from the Associate's wages or other cash compensation paid to the Associate by the Company and/or the Employer (including from the settlement of Phantom Stock Units subject to this Agreement).

Depending on the withholding method, the Company may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding rates or other applicable withholding rates, including maximum applicable rates, in which case the Associate will receive a refund of any over-withheld amount.

Finally, the Associate agrees to pay to the Company or the Employer any amount of Tax-Related Items that the Company or the Employer may be required to withhold or account for as a result of the Associate's participation in the Plan that cannot be satisfied by the means previously described.  The Company may refuse to issue cash upon settlement of the Phantom Stock Units, if the Associate fails to comply with the Associate's obligations in connection with the Tax-Related Items.

Section 2.5 - Dividend Equivalents

On each date that a cash dividend is paid to holders of Shares during the Performance Period, an amount (the "Dividend Equivalent Amount") equal to the cash dividend that is paid on each Share, multiplied by the Number of Granted Units and any Dividend Equivalent Phantom Stock Units (as defined below) that remain unvested and outstanding as of the dividend payment date, shall be credited for the benefit of the Associate, and such credited amount shall be converted into an additional number of Phantom Stock Units ("Dividend Equivalent Phantom Stock Units") determined by dividing the Dividend Equivalent Amount by the Fair Market Value of a Share on the date of the dividend payment.  Dividend Equivalent Phantom Stock Units will be subject to the same conditions as the underlying Phantom Stock Units with respect to which Dividend Equivalent Phantom Stock Units were paid.  Unless expressly provided otherwise, as used elsewhere in this Agreement, including Schedule A, "Phantom Stock Units" shall include any Dividend Equivalent Phantom Stock Units that have been credited to the Associate pursuant to this Section 2.5.

Section 2.6 - Acceptance of Agreement

The Associate agrees to execute and deliver or electronically accept, in the manner and within the period specified in the Associate's online account with the Company's designated broker/stock plan administrator, the Agreement including any applicable schedules thereto.  The SAC may, in its sole discretion, cancel the Phantom Stock Units if the Associate fails to execute and deliver or electronically accept the Agreement and documents within the specified period.

Section 2.7 - Clawback Policy

The Company may cancel all or part of the Phantom Stock Units or require payment by the Associate to the Company of all or part of any amount acquired by the Associate upon vesting and

4

settlement of the Phantom Stock Units pursuant to the Company's Clawback Policy as stated in Section 10 of the Plan.

ARTICLE III

VESTING REQUIREMENTS

Section 3.1 - Vesting

(a)       Except as otherwise provided in this Section 3.1, the Phantom Stock Units shall vest to the extent the Performance Objectives are attained and subject to the Associate's continued employment with the Company or any Designated Associate Company through the Vesting Date .

(b)       In the event of the Associate's Termination of Service prior to the Vesting Date, any unvested Phantom Stock Units shall be forfeited immediately by the Associate, except as otherwise specified in this Section 3.1.

(c)       In the event of the Associate's Termination of Service prior to the Vesting Date due to Retirement, unless otherwise required by applicable local law or otherwise determined by the SAC, the Associate may submit prior to Associate's Retirement an application to the SAC in the form prescribed by the SAC, requesting to vest in a number of Phantom Stock Units equal to the product of the number of Phantom Stock Unit that would otherwise become eligible to vest at the end of the Performance Period based on the attainment of the Performance Objectives, multiplied by the Pro Rata Factor, provided the Associate certifies at the end of the Performance Period on the date specified in the certification form that the Associate complied with the provisions of the Restrictive Covenants Agreement throughout the period commencing on the Grant Date and ending on the Vesting Date.  The "Pro Rata Factor" means a fraction, the numerator of which is the number of days of service the Associated completed between the Grant Date and the date of the Associate's Termination of Service, and the denominator of which is the total number of days in the Performance Period.  The SAC, in its sole discretion, shall determine whether an Associate's application for vesting acceleration pursuant to this Section 3.1(c) will be approved, subject to any requirements under applicable laws.

(d)       Except as otherwise provided in Section 3.1(e), upon an Associate's Termination of Service due to death or Permanent Disability, the Associate (or the Associate's estate, as applicable) shall be entitled to vest in the Phantom Stock Units that become eligible to vest based on the attainment of the Performance Objectives at the end of the Performance Period without regard to the service vesting requirement.

(e)       In the event of the Associate's Termination of Service prior to the Vesting Date for any reason other than a termination by the Employer for Cause, the SAC, in its sole discretion, may deem the service requirement and the Performance Objective requirement met for all or a portion of the unvested Phantom Stock Units at a vesting rate that may not exceed the sum of the Number of Granted Units, plus any Dividend Equivalent Phantom Stock Units that were credited to such Phantom Stock Units.

(f)       In the event of a Change of Control prior to the Vesting Date, the SAC, in its sole discretion, may deem the service requirement and the Performance Objective requirement met for all or a portion of the unvested Phantom Stock Units at a vesting rate that may not exceed the sum of the Number of Granted Units, plus any Dividend Equivalent Phantom Stock Units that were credited to such Phantom Stock Units.

Section 3.2 - Settlement

(a)     Upon vesting of the Phantom Stock Awards, the Associate shall receive a payment in cash equal to product of the number of Phantom Stock Units (whole and fractional) that vest, multiplied by the Terminal Price (as defined in Schedule A). Payments shall be settled in cash through local payroll. The Spot Exchange Rates utilized by the Company's Finance function on the date the Phantom Stock Units vest shall be used to convert the final value from US Dollars into local currency. No adjustments will be made to the amounts payable under the Phantom Stock Units to reflect any fluctuating exchange rates between the Grant Date and the settlement date.

(b)     The vested Phantom Stock Units shall be settled as soon as reasonably practicable, and in any event within 30 days, following the Vesting Date or such earlier date that the Phantom Stock Units become vested on an accelerated basis pursuant to Sections 3.1(d) through 3.1(f) of this Agreement.

Section 3.3 - Limitation on Obligations

The Company's obligation with respect to the Phantom Stock Units granted hereunder is limited solely to the delivery to the Associate of cash within the period when such Phantom Stock Units are due to be settled hereunder. The Phantom Stock Units shall not be secured by any specific assets of the Company or any of its Subsidiaries or Designated Associate Companies, nor shall any assets of the Company or any of its Subsidiaries or Designated Associate Companies be designated as attributable or allocated to the satisfaction of the Company's obligations under this Agreement. In addition, the Company shall not be liable to the Associate for damages relating to any delays in issuing cash to the Associate (or his designated entities), or any mistakes or errors in the issuance of cash to the Associate (or his designated entities).

ARTICLE IV

ADDITIONAL TERMS AND CONDITIONS OF THE PHANTOM STOCK UNITS

Section 4.1  - Nature of Award

In accepting the Phantom Stock Units, the Associate acknowledges, understands and agrees that:

(a)     the Plan is established voluntarily by the Company, is discretionary in nature and may be amended, suspended or terminated by the Company at any time, to the extent permitted by the Plan;

(b)     the Phantom Stock Unit is voluntary and occasional and does not create any contractual or other right to receive future Phantom Stock Units, or benefits in lieu of Phantom-Stock Units, even if Phantom Stock Units have been granted in the past;

(c)     all decisions with respect to future Phantom Stock Units or other grants, if any, will be at the sole discretion of the Company;

(d)     the Associate's participation in the Plan is voluntary;

(e)     the Phantom Stock Units and any cash acquired under the Plan are not intended to replace any pension rights or compensation under any pension arrangement;

(f)     the Phantom Stock Units and any cash acquired under the Plan are not part of normal or expected compensation or salary for any purposes, including, but not limited to, calculating any

severance, resignation, termination, redundancy, end of service payments, dismissal, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments;

(g)    unless otherwise agreed with the Company, the Phantom Stock Units and the cash subject to the Phantom Stock Units are not granted as consideration for, or in connection with, services the Associate may provide as a director of any Subsidiary or affiliate;

(h)    no claim or entitlement to compensation or damages shall arise from forfeiture of the Phantom Stock Units resulting from the Associate's Termination of Service (for any reason whatsoever, whether or not later found to be invalid or in breach of employment laws in the jurisdiction where the Associate is employed or the terms of his or her employment agreement, if any);

(i)    unless otherwise provided in the Plan or by the Company in its discretion, the Phantom Stock Units and the benefits evidenced by this Agreement do not create any entitlement to have the Phantom Stock Units or any such benefits transferred to, or assumed by, another company nor to be exchanged, cashed out or substituted for, in connection with any Change of Control or similar event affecting the Shares of the Company; and

(j)    if the Associate is providing services outside the United States, neither the Company, the Employer nor any Subsidiary or Designated Associate Company shall be liable for any foreign exchange rate fluctuation between the Associate's local currency and the United States Dollar that may affect the value of the Phantom Stock Units or of any amounts due to the Associate pursuant to the settlement of the Phantom Stock Units.

Section 4.2  - No Advice Regarding Grant

The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Associate's receipt of the Phantom Stock Units or participation in the Plan or the issuance of cash upon vesting and achievement of the Performance Objectives.  The Associate should consult with his or her own personal tax, legal and financial advisors regarding his or her Phantom Stock Units or participation in the Plan before taking any action related to the Phantom Stock Units or the Plan.

ARTICLE V

DATA PRIVACY NOTICE AND CONSENT

Section 5.1  - Data Privacy

(a)    *The Associate hereby explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of the Associate's personal data as described in this Agreement and any other Phantom Stock Unit materials by and among, as applicable, the Employer, the Company and its Subsidiaries and Designated Associate Companies for the exclusive purpose of implementing, administering and managing the Associate's participation in the Plan.*

(b)    *The Associate understands that the Company and the Employer may hold certain personal information about the Associate, including, but not limited to, the Associate's name, home address, telephone number, email address, telephone number, date of birth, passport, social insurance or other identification number (e.g., resident registration number), compensation, nationality, job title, any Shares or directorships held in the Company, details of all Phantom Stock Units or any other entitlement to Shares awarded, canceled, exercised, vested, unvested or outstanding in the Associate's*

7

*favor, including the price of the Shares and the date, place and volume of transactions ("Data"), for the exclusive purpose of implementing, administering and managing the Plan.*

(c)     *The Associate understands that Data will be transferred to Computershare or Morgan Stanley or to any other third party assisting in the implementation, administration and management of the Plan.  Where required under applicable law, Data also may be disclosed to certain securities or other regulatory authorities where the Company's Shares are listed or traded or regulatory filings are made.  The Associate understands that the recipients of Data may be located in the Associate's country or elsewhere, and that the recipients' country (e.g., Ireland) may have different data privacy laws and protections from the Associate's country.  The Associate understands that he may request a list with the names and addresses of any potential recipients of the Data by contacting his local human resources representative.  The Associate authorizes the Company, Computershare, Morgan Stanley and any other recipients of Data which may assist the Company (presently or in the future) with implementing, administering and managing the Plan to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purpose of implementing, administering and managing his participation in the Plan.  The Associate understands that Data will be held only as long as is necessary to implement, administer and manage the Associate's participation in the Plan.  The Associate understands that, he may at any time view Data, request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing his local human resources representative.  Further, the Associate understands that he is providing the consents herein on a purely voluntary basis.  If the Associate does not consent, or if the Associate later seeks to revoke his consent, his service with the Company will not be affected; the only consequence of refusing or withdrawing the Associate's consent is that the Company would not be able to grant the Associate Phantom Stock Units or equity awards or administer or maintain such awards.  Therefore, the Associate understands that refusing or withdrawing his consent may affect the Associate's ability to participate in the Plan.  For more information on the consequences of the Associate's refusal to consent or withdrawal of consent, the Associate understands that he may contact his local human resources representative.*

(d)     *Further, the Associate understands that he or she is providing the consents herein on a purely voluntary basis.  If the Associate does not consent, or if the Associate later seeks to withdraw his or her consent, his or her employment status or service with the Employer will not be affected; the only consequence of refusing or withdrawing consent is that the Company would not be able to grant the Associate Phantom Stock Units or other equity awards or administer or maintain such awards.  Therefore, the Associate understands that refusing or withdrawing his or her consent may affect the Associate's ability to participate in the Plan.  For more information on the consequences of the Associate's refusal to consent or withdrawal of consent, the Associate understands that he or she may contact his or her local human resources representative.*

## ARTICLE VI

### AGREEMENT OF RESTRICTIVE COVENANTS AND OTHER OBLIGATIONS

Section 6.1  - Restrictive Covenants and Other Obligations

In consideration of the grant of Phantom Stock Units, the Associate shall enter into the Restrictive Covenants Agreement.  In the event the Associate does not sign and return or electronically accept the Restrictive Covenants Agreement in the manner and within the period specified in the Associate's online account with the Company's designated broker/stock plan administrator, the SAC may, in its sole discretion, cancel the Phantom Stock Units.

ARTICLE VII

MISCELLANEOUS

Section 7.1 - Administration

The SAC shall have the power to interpret the Plan and this Agreement and to adopt such rules for the administration, interpretation and application of the Plan as are consistent therewith and to interpret or revoke any such rules.  All actions taken and all interpretations and determinations made by the SAC shall be final and binding upon the Associate, the Company and all other interested persons.  No member of the SAC shall be personally liable for any action, determination or interpretation made in good faith with respect to the Plan or the Phantom Stock Units.  In its absolute discretion, the SAC may at any time and from time to time exercise any and all rights and duties of the SAC under the Plan and this Agreement.

Section 7.2 - Phantom Stock Units Not Transferable

Neither the Phantom Stock Units nor any interest or right therein or part thereof shall be subject to the debts, contracts or engagements of the Associate or his successors in interest or shall be subject to disposition by transfer, alienation, anticipation, pledge, encumbrance, assignment or any other means whether such disposition be voluntary or involuntary or by operation of law by judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy), and any attempted disposition thereof shall be null and void and of no effect; provided, however, that this Section 7.2 shall not prevent transfers made solely for estate planning purposes or under a will or by the applicable laws of inheritance.

Section 7.3  - Binding Effect

The provisions of this Agreement shall be binding upon and accrue to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

Section 7.4  - Notices

Any notice to be given under the terms of this Agreement to the Company shall be addressed to the Company at the following address:

> Willis Towers Watson plc
> c/o Matthew S. Furman
> General Counsel
> 200 Liberty Street
> New York, NY 10281

and any notice to be given to the Associate shall be at his address.

By a notice given pursuant to this Section 7.4, either party may hereafter designate a different address for notices to be given to him.  Any notice that is required to be given to the Associate shall, if the Associate is then deceased, be given to the Associate's personal representatives if such representatives have previously informed the Company of their status and address by written notice under this Section 7.4.  Any notice shall have been deemed duly given when sent by facsimile or enclosed in a properly sealed envelope or wrapper addressed as aforesaid, deposited (with postage prepaid) in a post office or branch post office regularly maintained by the United States Postal Service or the United Kingdom's Post

Office or in the case of a notice given by an Associate resident outside the United States of America or the United Kingdom, sent by facsimile or by a recognized international courier service.

Section 7.5  -  Titles

Titles are provided herein for convenience only and are not to serve as a basis for interpretation or construction of this Agreement.

Section 7.6 -  Applicability of Plan

The Phantom Stock Units shall be subject to all of the terms and provisions of the Plan, to the extent applicable.  In the event of any conflict between this Agreement and the Plan, the terms of the Plan shall control.

Section 7.7 -  Amendment

This Agreement may be amended only by a document executed by the parties hereto, which specifically states that it is amending this Agreement.

Section 7.8  -  Governing Law

This Agreement shall be governed by, and construed in accordance with the laws of Ireland without regard to its conflicts of law provisions; provided, however, that the Restrictive Covenants Agreement, if applicable, shall be governed by and construed in accordance with the laws specified in that agreement without regard to conflicts of law provisions.

Section 7.9  -  Jurisdiction

The state and federal courts located in the County of New York, State of New York shall have exclusive jurisdiction to hear and determine any suit, action or proceeding and to settle any disputes, which may arise out of or in connection with this Agreement and, for such purposes, the parties hereto irrevocably and unconditionally submit to the exclusive jurisdiction of such courts; provided, however, that with respect to the Restrictive Covenants Agreement the courts specified in such agreements shall have jurisdiction to hear and determine any suit, action or proceeding and to settle any disputes which may arise out of or in connection with that agreement.

Section 7.10  -  Electronic Delivery and Acceptance

The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means.  The Associate hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party broker/stock plan administrator designated by the Company.  Further, to the extent that this Agreement has been executed on behalf of the Company electronically, the Associate accepts the electronic signature of the Company.

Section 7.11 -  Choice of Language

By accepting the Agreement providing for the terms and conditions of the Associate's grant, the Associate confirms having read and understood the documents relating to this grant (the Plan and the Agreement) which were provided in English language.  The Associate accepts the terms of those documents accordingly.

Section 7.12 - <u>Severability</u>

The provisions of this Agreement are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

Section 7.13 - <u>Schedule B</u>

The Phantom Stock Units shall be subject to any special provisions set forth in Schedule B for the Associate's country of residence, if any.  If the Associate relocates to one of the countries included in Schedule B prior to the vesting of the Phantom Stock Units, the special provisions for such country shall apply to the Associate, to the extent the Company determines that the application of such provisions is necessary or advisable for legal or administrative reasons.  Schedule B constitutes part of this Agreement.

Section 7.14 - <u>Imposition of Other Requirements</u>

The Company reserves the right to impose other requirements on the Phantom Stock Units, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the Associate to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

Section 7.15 - <u>Waiver</u>

The Associate acknowledges that a waiver by the Company of breach of any provision of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement, or of any subsequent breach by the Associate or any other Associate of the Plan.

Section 7.16 - <u>Counterparts</u>

This Agreement may be executed in any number of counterparts (including by facsimile), each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument.

Section 7.17  - <u>Code Section 409A</u>

For purposes of United States taxpayers, it is intended that the Phantom Stock Units will comply with the provisions of Section 409A of the Code and the Treasury Regulations relating thereto so as not to subject the Associate to the payment of additional taxes and interest under Section 409A of the Code, and this Agreement will be interpreted, operated and administered in a manner that is consistent with this intent.  In furtherance of this intent, the SAC may adopt such amendments to this Agreement or adopt other policies and procedures (including amendments, policies and procedures with retroactive effect), or take any other actions, in each case, without the consent of the Associate, that the SAC determines are reasonable, necessary or appropriate to comply with the requirements of Section 409A of the Code and related United States Department of Treasury guidance. In that light, the Company, its Subsidiaries and any Designated Associate Companies make no representation or covenant to ensure that the Phantom Stock Units that are intended to be exempt from, or compliant with, Section 409A of the Code are not so exempt or compliant or for any action taken by the SAC with respect thereto. Nothing in the Agreement shall provide a basis for any person to take action against the Company, its Subsidiaries or its Designated Associate Companies based on matters covered by Section 409A of the Code, including the tax treatment of any  payments made under the Phantom Stock Units granted hereunder, and the Company, its Subsidiaries and any Designated Associate Companies shall not under any circumstances have any liability to the Associate or his estate or any other party for any taxes, penalties or interest due on amounts

paid or payable under this Agreement, including taxes, penalties or interest imposed under Section 409A of the Code.

***By the Associate's execution or electronic acceptance of this Agreement (including the Schedules attached hereto) in the manner specified in the Associate's online account with the Company's designated broker/stock plan administrator, the Associate and the Company have agreed that the Phantom Stock Units are granted under and governed by the terms and conditions of the Plan and this Agreement (including the Schedules attached hereto).***

WILLIS TOWERS WATSON PUBLIC LIMITED COMPANY

By:

Name:   Anne Donovan Bodnar
Title:    Chief Human Resources Officer

## <u>SCHEDULE A</u>

### PERFORMANCE OBJECTIVES FOR PHANTOM STOCK UNITS

The following Performance Objectives shall apply to the determination of the number of Phantom Stock Units, if any, that shall be become eligible to vest in accordance with the terms of the Agreement.

The total number (*i.e.*, 100%) of Phantom Stock Units will become eligible to vest if the Terminal Price is equal to or exceeds the Vesting Price, *where*:

"**Terminal Price**" means the average of the closing prices of an Ordinary Share for the 30 trading days immediately preceding the last day of the Performance Period;

"**Vesting Price**" means the Grant Value Determination Date Price <u>plus</u> CAGR of 5% during the Performance Period.

"**Grant Value Determination Date Price**" means the average of the closing prices of an Ordinary Share for the 30 trading days immediately preceding April 2, 2018.

If the Terminal Price is less than the Vesting Price, the total number of Phantom Stock Units that will become eligible to vest will be equal to the product of (i) the Number of Granted Units, multiplied by (ii) the Vesting Percentage, *where:*

"**Vesting Percentage**" means, 100% minus the product of (A) 4% multiplied by (B) the number of percentage points by which the Terminal Price is less than the Vesting Price.

No Phantom Stock Units will vest unless the Terminal Price is more than 75% of the Vesting Price.

<u>**SCHEDULE B**</u>

**COUNTRY-SPECIFIC APPENDIX TO PHANTOM STOCK UNIT AWARD AGREEMENT**

**WILLIS TOWERS WATSON PUBLIC LIMITED COMPANY**
**2012 EQUITY INCENTIVE PLAN**

Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement or the Plan.

*Terms and Conditions*

This Schedule B includes additional terms and conditions that govern the Phantom Stock Units granted to the Associate if the Associate resides in one of the countries listed below.  This Schedule B forms part of the Agreement.  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

*Notifications*

This Schedule B also includes information based on the securities, exchange control and other laws in effect in the Associate's country as of March 2018.  Such laws are often complex and change frequently.  As a result, the Company strongly recommends that the Associate not rely on the information noted herein as the only source of information relating to the consequences of the Associate's participation in the Plan because the information may be out of date at the time the Associate vests in the Phantom Stock Units or the Phantom Stock Units become payable.

In addition, the information is general in nature.  The Company is not providing the Associate with any tax advice with respect to the Phantom Stock Units.  The information is provided below may not apply to the Associate's particular situation, and the Company is not in a position to assure the Associate of any particular result.  *Accordingly, the Associate should seek appropriate professional advice as to how the tax or other laws in the Associate's country apply to the Associate's situation.*

Finally, if the Associate  is a citizen or resident of a country other than the one in which the Associate is currently residing and/or working, transfers employment and/or residency after the Phantom Stock Units are granted, or is considered a resident of another country for local law purposes, the terms and conditions contained herein for the country the Associate is residing and/or working in at the time of the grant may not be applicable to the Associate, and the Company shall, in its discretion, determine to what extent the terms and conditions contained herein shall be applicable to the Associate.  Similarly, the information contained herein may no longer be applicable in the same manner.

<u>**ARGENTINA**</u>

There are no country-specific provisions.

<u>**AUSTRALIA**</u>

*Securities Law Information*
The offer of the Phantom Stock Units is intended to comply with the provisions of the Corporations Act 2001, ASIC Regulatory Guide 49 and ASIC Class Order CO 14/1000.  Additional details are set forth in the Offer Document for the offer of the Phantom Stock Units to Australian resident employees, which will be provided to the Associate with the Agreement.

**BELGIUM**

There are no country-specific provisions.

**BERMUDA**

There are no country-specific provisions.

**BRAZIL**

**Compliance with Law**
By accepting the Phantom Stock Units, the Associate acknowledges that he agrees to comply with applicable Brazilian laws and pay any and all applicable Tax-Related Items associated with the grant and vesting of the Phantom Stock Units.

**CAMEROON**

There are no country specific provisions.

**CANADA**

***The following provisions apply to the Phantom Stock Units if the Associate is a resident of Quebec***

**Language Consent**
The parties acknowledge that it is their express wish that the Agreement as well as all the documents, notices and legal proceedings entered into, given, or instituted pursuant hereto or relating directly or indirectly hereto, be drawn up in English.

***Consentement relatif à la langue***
*Les parties reconnaissent avoir exigé la rédaction en anglais du Contrat, ainsi que de tous documents exécutés, avis donnés et procédures judiciaires intentées, directement ou indirectement, relatifs au, ou suite au, Contrat.*

**Data Privacy**
The following provision supplements Section 5.1 of the Agreement:

The Associate hereby authorizes the Company and the Company's representatives to discuss with and obtain all relevant information from all personnel (professional or not) involved in the administration and operation of the Plan.  The Associate further authorizes the Company and the Employer to disclose and discuss with their advisors the Associate's participation in the Plan.  The Associate also authorizes the Company and the Employer to record such information and to keep it in his employment file.

**CAYMAN**

There are no country-specific provisions.

**CHILE**

There are no country-specific provisions.

**CHINA**

**Phantom Stock Units Granted for Retention Purposes Only**
The following provision supplements Section 4.1 of the Agreement:

Notwithstanding anything contrary in the Agreement, the Associate understands and agrees that the Phantom Stock Units are granted by the Company to the Associate for retention purposes only and do not constitute part of the Associate's normal compensation or salary.

## COLOMBIA

**Labor Law Acknowledgment**
The following provision supplements Section 4.1 of the Agreement:

The Associate acknowledges that pursuant to Article 128 of the Colombian Labor Code, the Plan and related benefits do not constitute a component of "salary" for any legal purpose. Therefore, the Phantom Stock Units and related benefits will not be included and/or considered for purposes of calculating any and all labor benefits, such as legal/fringe benefits, vacations, indemnities, payroll taxes, social insurance contributions and/or any other labor-related amount which may be payable.

## DENMARK

**Nature of Award**
The following provision supplements Section 4.1 of the Agreement:

By participating in the Plan, the Associate understands and agrees that the grant of the Phantom Stock Units relate to future services to be performed and are not a bonus or compensation for past services.

## EGYPT

There are no country-specific provisions.

## FINLAND

There are no country-specific provisions.

## FRANCE

**Language**
By accepting the Phantom Stock Units and the Agreement, which provides for the terms and conditions of the Phantom Stock Units, the Associate confirms having read and understood the documents relating to this grant (including the Agreement and Schedules A and B) which were provided in English language. The Associate accepts the terms of those documents accordingly.

***Langue Utilisée.***
*En acceptant l'Attribution de primes en espèces différées (« Phantom Stock Units ») et le Contrat qui contient les termes et conditions de l'Attribution de primes en espèces différées, le Associate confirme avoir lu et compris les documents relatifs à cette attribution (en ce compris, le Contrat et les Annexes A et B) qui ont été transmis en langue anglaise. Le Associate accepte les termes de ces documents en connaissance de cause.*

## GERMANY

There are no country-specific provisions.

**HONG KONG**

**Vesting upon Termination of Employment due to Death or Disability**
Upon the termination of Associate's employment due to the Associate's death or disability, the treatment contemplated under Section 3.1(d) shall not apply and Section 3.1 shall apply to the Associate without giving effect to Section 3.1(d).

**Securities Law Information**
*WARNING.  The Phantom Stock Units do not constitute a public offering of securities under Hong Kong law and are available only to employees of the Company or Subsidiary or Designated Associate Company.*

*The Agreement, including this Schedule B, the Plan and other incidental communication materials have not been prepared in accordance with and are not intended to constitute a "prospectus" for a public offering of securities under the applicable securities legislation in Hong Kong, nor have the documents been reviewed by any regulatory authority in Hong Kong.  The Agreement, including this Schedule B, the Plan and other incidental communication materials are intended only for the personal use of each eligible employee and not for distribution to any other person.  The Associate is advised to exercise caution in relation to the Phantom Stock Units.  If the Associate has questions about any of the contents of the Agreement, including this Schedule B, or any other incidental communication materials distributed in connection with the Phantom Stock Units, the Associate should obtain independent professional advice.*

**INDIA**

There are no country-specific provisions.

**IRELAND**

There are no country-specific provisions.

**ITALY**

**Data Privacy**
*The following provision replaces Section 5.1 of the Agreement:*

***Pursuant to Section 13 of the Legislative Decree no. 196/2003, the Associate hereby explicitly and unambiguously consents to the collection, use, processing and transfer, in electronic or other form, of the Associate's personal data as described in this Schedule B by and among, as applicable, the Associate's Employer, the Company and Subsidiary or Designated Associate Company for the exclusive purpose of implementing, administering, and managing the Associate's participation in the Plan.***

***The Associate understands that the Company, the Employer and Subsidiary or Designated Associate Company may hold certain personal information about the Associate, including, but not limited to, the Associate's name, home address and telephone number, email address, date of birth, social insurance (to the extent permitted under Italian law), passport or other identification number (e.g., resident registration number), salary, nationality, job title, any shares or directorships held in the Company or any Subsidiary or Designated Associate Company, details of all Phantom Stock Units granted, or any other entitlement to Phantom Stock Units awarded, cancelled, exercised, vested, unvested or outstanding in the Associate's favor, for the exclusive purpose of implementing, managing and administering the Plan ("Data").***

***The Associate also understands that providing the Company with Data is necessary for the performance of the Plan and that the Associate's refusal to provide such Data would make it***

17

*impossible for the Company to perform its contractual obligations and may affect the Associate's ability to participate in the Plan. The Controller of personal data processing is 200 Liberty Street, New York, NY 10281 USA, and, pursuant to Legislative Decree no. 196/2003, its Representative in Italy for privacy purposes is Willis Italia S.p.A. Via Tortona 33 Palazzo Athena Ground Floor Milano 20144 Italy.*

*The Associate understands that Data will not be publicized, but it may be transferred to banks, other financial institutions, or brokers involved in the management and administration of the Plan. The Associate understands that Data may also be transferred to the independent registered public accounting firm engaged by the Company. The Associate further understands that the Company and/or any Subsidiary or Designated Associate Company will transfer Data among themselves as necessary for the purposes of implementing, administering and managing the Associate's participation in the Plan, and that the Company and/or any Subsidiary or Designated Associate Company may each further transfer Data to third parties assisting the Company in the implementation, administration, and management of the Plan, including any requisite transfer of Data to a broker or other third party with whom the Associate may elect to deposit any cash payments acquired at vesting of the Phantom Stock Units. Such recipients may receive, possess, use, retain, and transfer Data in electronic or other form, for the purposes of implementing, administering, and managing his participation in the Plan. The Associate understands that these recipients may be located in or outside of the European Economic Area, such as in the United States or elsewhere. Should the Company exercise its discretion in suspending all necessary legal obligations connected with the management and administration of the Plan, it will delete Data as soon as it has completed all the necessary legal obligations connected with the management and administration of the Plan.*

*The Associate understands that Data processing related to the purposes specified above shall take place under automated or non-automated conditions, anonymously when possible, that comply with the purposes for which Data is collected and with confidentiality and security provisions, as set forth by applicable laws and regulations, with specific reference to Legislative Decree no. 196/2003.*

*The processing activity, including communication, the transfer of Data abroad, including outside of the European Economic Area, as herein specified and pursuant to applicable laws and regulations, does not require his consent thereto, as the processing is necessary to performance of contractual obligations related to implementation, administration, and management of the Plan. The Associate understands that, pursuant to Section 7 of the Legislative Decree no. 196/2003, the Associate has the right to, including but not limited to, access, delete, update, correct, or terminate, for legitimate reason, the Data processing.*

*Furthermore, the Associate is aware that Data will not be used for direct-marketing purposes. In addition, Data provided can be reviewed and questions or complaints can be addressed by contacting his local human resources representative.*

**Agreement Document Acknowledgement**

In accepting the Phantom Stock Units, the Associate acknowledges that the Associate has received a copy of the Agreement and has reviewed it, including Schedules A and B, in its entirety and fully understands and accepts all provisions of the Agreement, including Schedules A and B.

The Associate acknowledges that the Associate has read, understands and specifically and expressly approves the following sections of the Agreement: Section 2.4; "Withholding Obligations"; Section 3.1 "Vesting"; Section 7.2 "Phantom Units Non-Transferable"; Section 4.1 "Nature of Award"; Section 7.8 "Governing Law"; Section 7.10 "Electronic Delivery and Acceptance"; Section 7.11 "Choice of Language"; Section 7.13 "Schedule B"; Section 7.14 "Imposition of Other Requirements"; and the "Data privacy" provision of this Schedule B.

## JAPAN

There are no country-specific provisions

## LUXEMBOURG

There are no country-specific provisions.

## MEXICO

### Policy Statement
The grant of the Phantom Stock Units is a unilateral and discretionary award and, therefore, the Company reserves the absolute right to amend the Plan and discontinue it at any time without any liability.

The Company, with offices at 200 Liberty Street, New York, NY 10281 USA, is solely responsible for the administration of the Plan, and the grant of the Phantom Stock Units does not, in any way, establish an employment relationship between the Associate and the Company since the Associate is participating in the Plan on a wholly commercial basis and the sole employer is a Mexican participating entity.

### Plan Acknowledgment
By accepting the Phantom Stock Units, the Associate acknowledges that the Associate has received copies of the Agreement, including Schedules A and B, setting forth the terms and conditions of the Plan and the Phantom Stock Units thereunder.

In addition, the Associate expressly agrees that: (i) participation in the Plan does not constitute an acquired right; (ii) the Plan is offered by the Company on a wholly discretionary basis; (iii) participation in the Plan is voluntary; and (iv) the Associate has no right to the Phantom Stock Units until they are actually paid to the Associate.

Finally, the Associate hereby declares that the Associate does not reserve any action or right to bring any claim against the Company for any compensation or damages as a result of his participation in the Plan and therefore grants a full and broad release to the Employer, the Company and Subsidiary or Designated Associate Company with respect to any claim that may arise under the Agreement.

### Spanish Translation

#### *Declaración de Política*
*El Otorgamiento de los Premios en Efectivo tiene una naturaleza unilateral y discrecional, por lo tanto, la Compañía se reserva el derecho absoluto de modificar y discontinuar el Plan en cualquier tiempo, sin responsabilidad alguna.*

*La Compañía, con oficinas registradas ubicadas en 200 Liberty Street, New York, NY 10281 Estados Unidos de América será el único responsable de la administración del Plan y el otorgamiento de Premios en Efectivo no establece de ninguna manera una relación laboral entre el Associatee y la Compañía, ya que el Associatee está participando en el Plan sobre una base comercial siendo su único patrón una Empresa Associatee Mexicana.*

#### *Reconocimiento del Plan*
*Al aceptar los Premios en Efectivo, el Associatee reconoce que el Associatee ha recibido copias del Contrato,incluyendo loa Apéndices A y B que establecen los términos y condiciones del Plan y los Premios en Efectivo que se otrogan a través del mismo.*

*Adicionalmente, el Associatee expresamente reconoce que (i) la participación en el Plan no constituye un*

*derecho adquirido; (ii) el Plan se ofrecen por la Compañía de manera enteramente discrecional; (iii) la participación en el Plan es voluntaria; y (iv) el Associatee no tendrá derecho alguno a los Premios en Efectivo hasta que se hayan realmente pagado al Associatee (i.e., en la fecha de Pago deEfectivo (en Íngles, "Cash Payment")).*

*Finalmente, en este acto el Associatee declara que el Associatee no se reserva ninguna acción o derecho para interponer una reclamación o demanda en contra de la Compañía por compensación, daño o perjuicio alguno como resultado de su participación en el Plan y, por lo tanto, otorga el más amplio y total finiquito a su Patrón, a la Compañía y Subsidiaria o cualquier Empresa Asociada Designada  en relación con cualquier reclamación que pudiera surgir de conformidad con el Contrato.*

## NETHERLANDS

**Labor Law Acknowledgment**
By accepting the Phantom Stock Units, the Associate acknowledges that: (i) the Phantom Stock Units are intended as an incentive to remain employed with the Employer and are not intended as remuneration for labor performed; and (ii) the Phantom Stock Units are not intended to replace any pension rights or compensation.

## NEW ZEALAND

There are no country-specific provisions.

## NIGERIA

There are no country-specific provisions.

## NORWAY

There are no country-specific provisions.

## PERU

**Labor Law Acknowledgment**
By accepting the Phantom Stock Units, the Associate acknowledges that the Phantom Stock Units are being granted *ex gratia* with the purpose of rewarding the Associate.

## PHILIPPINES

There are no country-specific provisions.

## POLAND

There are no country-specific provisions.

## PORTUGAL

**Language Consent**
The following provision supplements Section 7.11 of the Agreement:

The Associate hereby expressly declares that he has full knowledge of the English language and has read, understood and fully accepted and agreed with the terms and conditions established in the Agreement.

***Conhecimento da Lingua***

*O Contratado, pelo presente instrumento, declara expressamente que tem pleno conhecimento da língua inglesa e que leu, compreendeu e livremente aceitou e concordou com os termos e condições estabelecidas no Acordo de Atribuição (Agreement em inglês).*

## PUERTO RICO

There are no country specific provisions.

## SINGAPORE

**Securities Law Information**
To the extent the Phantom Stock Units are deemed subject to the securities law regulations in Singapore, the offer of the Phantom Stock Units are being made pursuant to the "Qualifying Person" exemption under section 273(1)(f) of the Singapore Securities and Futures Act (Chapter 289, 2006 Ed.) (the "SFA"). Neither the Plan nor the Agreement has not been, nor will it be, lodged or registered as a prospectus with the Monetary Authority of Singapore.

**Chief Executive Officer and Director Notification Requirement.**  If the Associate is the Chief Executive Officer or a director, associate director or shadow director of a Singapore related corporation, the Associate is subject to certain notification requirements under the Singapore Companies Act, regardless of whether the Associate is a Singapore resident or employed in Singapore.  Among these requirements is the obligation to notify the Singapore related corporation in writing when the Associate receives or disposes of an interest (*e.g.,* the pach payment) in the Company or a related corporation. These notifications must be made within two (2) business days of acquiring or disposing of any interest in the Company or any related corporation or within two (2) business days of becoming the Chief Executive Officer, a director, associate director or shadow director if such an interest exists at that time.

## SOUTH AFRICA

There are no country-specific provisions.

## SPAIN

**Securities Law Information**
No "offer of securities to the public," as defined under Spanish law, has taken place or will take place in the Spanish territory in connection with the Phantom Stock Units.  The Agreement has not nor will it be registered with the *Comisión Nacional del Mercado de Valores* and does not constitute a public offering prospectus.

**Nature of Award**
This provision supplements Section 4.1 of the Agreement:

In accepting the Phantom Stock Units the Associate consents to participation in the Plan and acknowledges receiving a copy of the Agreement, including Schedules A and B.

The Associate understands and agrees that, as a condition of the grant of the Phan, except as provided for in Section 4.1 of the Agreement, the Associate's Termination of Service for any reason (including for the

reasons listed below) will automatically result in the forfeiture of the Phantom Stock Units that may have been granted to the Associate and that have not vested on the Termination Date.

In particular, the Associate understands and agrees that except as provided in the Agreement, the Phantom Stock Units will be forfeited without entitlement to the underlying cash payment or to any amount as indemnification in the event of a the Associate's Termination of Service prior to vesting by reason of, including, but not limited to: death, permanent disability, resignation, retirement, disciplinary dismissal adjudged to be with Cause, disciplinary dismissal adjudged or recognized to be without Cause, individual or collective layoff on objective grounds, whether adjudged to be with cause or adjudged or recognized to be without Cause, material modification of the terms of employment under Article 41 of the Workers' Statute, relocation under Article 40 of the Workers' Statute, Article 50 of the Workers' Statute, unilateral withdrawal by the Employer, and under Article 10.3 of Royal Decree 1382/1985.

Furthermore, the Associate understands that the Company has unilaterally, gratuitously and discretionally decided to grant the Phantom Stock Units to individuals who may be employees of the Company, its Subsidiaries or a Designated Associate Company. The decision is a limited decision that is entered into upon the express assumption and condition that any grant will not economically or otherwise bind the Company on an ongoing basis. Consequently, the Associate understands that the Phantom Stock Units are granted on the assumption and condition that the Phantom Stock Units and the cash payments shall not become a part of any employment or service contract (either with the Company, the Employer or any Subsidiary or Designated Associate Company) and shall not be considered a mandatory benefit, salary for any purposes (including severance compensation) or any other right whatsoever. In addition, the Associate understands that the Phantom Stock Units would not be granted to the Associate but for the assumptions and conditions referred to above; thus, the Associate acknowledges and freely accepts that should any or all of the assumptions be mistaken or should any of the conditions not be met for any reason, then any Phantom Stock Unit granted to the Associate shall be null and void.

## SWEDEN

There are no country-specific provisions.

## SWITZERLAND

There are no country-specific provisions.

## TAIWAN

**Data Privacy**
The Associate acknowledges that he has read and understands the terms regarding collection, processing and transfer of Data contained in Section 5.1 of the Agreement and agrees that, upon the request of the Company or the Employer, the Associate will provide any executed data privacy consent form to the Company or the Employer (or any other agreements or consents that may be required by the Company or the Employer) that the Company and/or the Employer may deem necessary to obtain under the data privacy laws in the Associate's country, either now or in the future. The Associate understands he will not be able to benefit from the Phantom Stock Units under the Agreement if he fails to execute any such consent or agreement.

## UNITED ARAB EMIRATES

**Nature of Award**
The following provision supplements Section 4.1 of the Agreement:

The Associate acknowledges that the Phantom Stock Units and related benefits do not constitute a component of his "wages" for any legal purpose. Therefore, the Phantom Stock Units and related benefits

will not be included and/or considered for purposes of calculating any and all labor benefits, such as social insurance contributions and/or any other labor-related amounts which may be payable.

## UNITED KINGDOM

**Tax Withholding Obligations**

The following provisions supplement Section 2.4 of the Agreement:

Without limitation to any provision of this Agreement, the Associate agrees that he is liable for all Tax-Related Items with respect to the Phantom Stock Units, as and when required by the Company or the Employer, as applicable, or by Her Majesty's Revenue and Customs ("HMRC") (or any other tax authority or other relevant authority). The Associate also agrees to indemnify and keep indemnified the Company and the Employer, as applicable, against any Tax-Related Items that they are required to pay or withhold or have paid or will pay on the Associate's behalf to HMRC (or any other tax authority or other relevant authority).

Notwithstanding the foregoing, if the Associate is an executive officer or a director of the Company within the meaning of Section 13(k) of the Exchange Act, the terms of the immediately foregoing provision will not apply. In the event that the Associate is an executive officer or a director and the income tax is not collected or paid by the Associate by the Due Date, the amount of any uncollected income tax may constitute a benefit to the Associate on which additional income tax and National Insurance contributions ("NICs") may be payable. The Associate acknowledges that the Associate will be responsible for reporting and paying any income tax due on this additional benefit directly to HMRC under the self-assessment regime and for reimbursing the Company or the Employer (as applicable) for the value of any employee NICs due on this additional benefit, which the Company or the Employer may recover from the Associate by any of the means referred herein.

## VENEZUELA

There are no country-specific provisions.

<u>**SCHEDULE C**</u>

**AGREEMENT OF RESTRICTIVE COVENANTS AND OTHER OBLIGATIONS FOR EMPLOYEES IN THE UNITED STATES**

This Agreement of Restrictive Covenants and Other Obligations for Employees in the United States (the "<u>RCA</u>") is entered into by and between Willis Towers Watson Public Limited Company (the "<u>Company</u>") and the associate (the "<u>Associate</u>") to be effective as of the date the Associate signs or electronically accepts this RCA.

**RECITALS**

**Whereas**, Associate is employed by a Subsidiary of the Company;

**Whereas**, subject to approval by the Committee or the Company's Share Award Committee, the Associate has been designated to receive a grant of Phantom Stock Units ("<u>Phantom Stock Units</u>" or "<u>Awards</u>") under the Company's 2012 Equity Incentive Plan (the "<u>Plan</u>");

**Whereas**, any Award granted to the Associate is subject to the terms and conditions of the Plan, the award agreement evidencing the Associate's Award (including any country specific terms thereto) and this RCA, and in consideration of the Award, the Associate shall enter into and acknowledge his or her agreement to the terms and conditions of the Plan, the award agreement and this RCA; and

**Whereas**, the Associate acknowledges and agrees that he or she desires to receive the Award and understands and agrees any Award is subject to the terms and conditions set forth in the Plan, the applicable award agreement and this RCA.

**NOW, THEREFORE**, in consideration of the mutual covenants and promises contained herein and for other valuable consideration, in particular the Award, the receipt and sufficiency of which is hereby acknowledged in this recital and within Section 6.4 below, the Parties hereto agree, with the intent to be bound, as follows:

Section 1 - <u>Recitals</u>

The Recitals set forth above are an integral part of this RCA, and are incorporated herein by reference.

Section 2 - <u>Definitions</u>

2.1.    "**Award**" shall have the meaning as set forth in the recitals.

2.2.    "**Business**" shall mean insurance brokerage, reinsurance brokerage, surety brokerage, bond brokerage, insurance agency, underwriting agency, managing general agency, risk management, claims administration, self-insurance, risk management consulting or other business performed by the Restricted Group.

2.3.    "**Committee**" shall have the same meaning as set forth in the Plan or the applicable award agreement.

2.4.    "**Competitor**" shall mean any business principally engaged in insurance brokerage, reinsurance brokerage, surety brokerage, bond brokerage, insurance agency, underwriting agency, managing general agency, risk management, claims administration, self-insurance, risk management consulting or other business which is either performed by the Restricted Group or is a business in which the Restricted Group has taken steps toward engaging.

2.5.    "**Confidential Information**" shall mean all trade secrets and non-public information concerning the financial data, strategic business plans, and other non-public, proprietary, and confidential information of the Restricted Group.  Confidential Information  includes, but is not limited to, the following information:  identities of Relevant Clients and Relevant Prospects; identities of companies from which any Subsidiary obtains insurance coverage for Relevant Clients and Relevant Prospects; policy terms, conditions, rates and  expiration dates pertaining to Relevant Clients and Relevant Prospects; risk characteristics of Relevant Clients and Relevant Prospects; and non-public information of the Restricted Group concerning insurance markets for particular risks. Confidential Information shall not include information that is within public domain, provided that Associate was not responsible, directly or indirectly, for such information entering the public domain without the Restricted Group's consent.

2.6.    "**Directly or indirectly**" shall mean the Associate acting either alone or jointly with or on behalf of or by means of or in concert with any other person, firm or company (whether as principal, partner, manager, employee, contractor, director, consultant, investor or similar capacity) or otherwise.

2.7.    "**Employer**" shall mean the Subsidiary that employs the Associate.  If the Company ever becomes an employer of the Associate, then the term Employer shall refer to the Company.

2.8.    "**Employment Agreement**" shall mean the contractual terms and conditions which govern the employment of the Associate by Employer.

2.9.    "**Key Personnel**" shall mean any person who is at the date the Associate ceases to be an employee of Employer or was (i) at any time during the period of twelve (12) months prior to that date employed by the Restricted Group, (ii) an employee with whom Associate had dealings, and (iii) employed by or engaged in the Business in a managerial capacity, or was an employee with insurance, reinsurance or other technical expertise.

2.10.    "**Plan**" shall have the meaning set forth in the recitals.

2.11.    "**Relevant Area**" shall mean the counties, parishes, districts, municipalities, cities, metropolitan regions, localities and similar geographic and political subdivisions, within and outside of the United States of America, in which the Employer, the Company or any of its Subsidiaries has carried on Business in which the Associate has been involved or concerned or working on at any time during the period of twelve (12) months prior to the date on which the Associate ceases to be employed by Employer.

2.12.    "**Relevant Client**" shall mean any person, firm or company who or which at any time during the period of twelve (12) months prior to the date on which the Associate ceases to be employed by Employer is or was a client or customer of the Employer, the Company or any of its Subsidiaries or was in the habit and/or practice of dealing under contract with the Employer, the Company or any of its Subsidiaries and with whom or which the Associate had dealings related to the Business) or for whose relationship with the Employer, the Company or any of its Subsidiaries the Associate had responsibility at any time during the said period.

2.13.    "**Relevant Period**" shall mean the period of twenty four (24) months following the date on which the Associate ceases to be employed by Employer.

2.14.    "**Relevant Prospect**" shall mean any person, firm or company who or which at any time during the period of six (6) months prior to the date on which the Associate ceases to be employed by Employer was an active prospective client of the Employer, the Company or

any of its Subsidiaries with whom or with which the Associate had dealings related to the Business (other than in a minimal and non-material way).

2.15.   "**Restricted Group**" shall mean the Company and its Subsidiaries, including the Employer, as in existence during the Associate's employment with Employer and as of the date such employment ceases.

2.16.   "**Subsidiary**" shall mean a direct and/or indirect subsidiary of the Company as well as any associate company which is designated by the Company as being eligible for participation in the Plan.

Section 3  - <u>Non-Solicit and Other Obligations</u>

3.1.   The Associate acknowledges that by virtue of his or her management position and as an employee of Employer, the Associate has acquired and will acquire knowledge of Confidential Information of the Restricted Group and their Business.  The Associate further acknowledges that the Confidential Information which the Restricted Group has provided and will provide to the Associate would give the Associate a significant advantage if the Associate were to directly or indirectly be engaged in any Business at a Competitor of the Restricted Group.

3.2.   Without the Company's prior written consent, the Associate shall not directly or indirectly, at any time during or after the Associate's employment with any Employer, disclose any Confidential Information and shall use the Associate's best efforts to prevent the taking or disclosure of any Confidential Information to a Competitor, or otherwise, except as reasonably may be required to be disclosed by the Associate in the ordinary performance of his or her duties for Employer or as required by law.  Notwithstanding the foregoing, you understand that if you make a confidential disclosure of a trade secret of the Company or other Confidential Information to a government official or an attorney for the sole purpose of reporting a suspected violation of law, or in a court filing under seal, or otherwise engage in activities protected under whistleblower statutes, you shall not be held liable under this Agreement or under any federal or state trade secret law for such a disclosure or engaging of such activity and shall also not be required to notify the Company of any such disclosure or engaging of any such activity.

3.3.   The Associate shall not, for the Relevant Period, directly or indirectly for a Competitor or otherwise:

3.3.1.   within the Relevant Area, solicit any Relevant Client or Relevant Prospect for the purposes of any Business which competes or will compete or seeks to compete with the Restricted Group;

3.3.2.   within the Relevant Area, accept, perform services for, or deal with any Relevant Client or Relevant Prospect for the purposes of any Business which competes or will compete or seeks to compete with the Restricted Group;

3.3.3.   solicit for employment or entice away from the Restricted Group any Key Personnel; or

3.3.4.   employ or engage or endeavour to employ or engage any Key Personnel.

3.4.   To the extent the Associate is a party to an Employment Agreement or other agreement with the Employer, the Company or any Subsidiary that contains post-employment covenants and restrictions, those post-employment covenants and restrictions shall be separate and apart and independent from the covenants and restrictions set forth in Sections 3.2 and 3.3 herein.

3.5.   The Associate shall not directly or indirectly, at any time during or after the Associate's employment with any Employer, take any action or make any statement, written or oral, that disparages or criticizes the business or management of the Employer, the Company or any Subsidiary or any of its or their respective directors, officers, agents, employees, products or services. Nothing contained herein limits or restricts any rights Associate may have to engage in protected concerted activity under the National Labor Relations Act.

3.6.   The Associate recognizes and agrees that the payment of damages will not be an adequate remedy for any breach by Associate of any of the covenants set forth in Section 3 of this RCA.  Associate recognizes that irreparable injury will result to Company and/or its Subsidiaries in the event of any such breach and therefore Associate agrees that Company may, in addition to recovering damages, proceed in equity to enjoin Associate from violating any such covenant.

3.7.   The Associate acknowledges that the provisions of this Section 3 are fair, reasonable and necessary to protect the goodwill and interests of the Restricted Group.

Section 4  - Governing Law & Jurisdiction

4.1.   This RCA shall be governed by and construed in accordance with the laws of the state of New York, without regard to its conflicts of law principles.

4.2.   Any suit, action or proceeding arising out of or relating to this RCA shall only be brought in the State and Federal Courts located in the County of New York, State of New York and the Parties hereto irrevocably and unconditionally submit accordingly to the exclusive jurisdiction of such courts for the purpose of any such suit, action or proceeding. The Associate hereby irrevocably and unconditionally waives any objections he or she may now have or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this RCA in the foregoing courts.  The Associate further acknowledges that for purposes of N.Y.C.P.L.R. 327(b) and  N.Y. G.O.L. Section 5-1402, the value of the Plan is in excess of One Million Dollars ($1,000,000) and the Associate hereby further irrevocably and unconditionally waives any claim that any such suit, action or proceeding brought in the foregoing courts has been brought in an inconvenient forum.

Section 5  - Consideration, Severability, Beneficiaries &  Effect on other agreements

5.1.   The Parties acknowledge that the provisions of this RCA are severable.  If any part or provision of this RCA shall be determined by any court or tribunal to be invalid, then such partial invalidity shall not cause the remainder of this RCA to be or become invalid.  If any provision hereof is held unenforceable on the basis that it exceeds what is reasonable for the protection of the goodwill and interests of the Restricted Group, but would be valid if part of the wording were modified or deleted, as permitted by applicable law, then such restriction or obligation shall apply with such deletions or modifications as may be necessary to make it enforceable.

5.2.   The Associate acknowledges that he or she remains bound by any Employment Agreement or any other agreement currently in effect by and between the Associate, on the one hand,  and the Employer, the Company or any Subsidiary, on the other hand, including but not limited to any post-employment covenants and restrictions,  and this RCA shall be in addition to, and not in place of any such agreements.

27

5.3.   Nothing contained in this RCA constitutes a promise or agreement to employ the Associate for a guaranteed term or otherwise modify the terms and conditions of the Associate's employment with the Employer.

Section 6 – <u>Miscellaneous</u>

6.1.   This RCA, and the provisions hereof, may not be modified, amended, terminated, or limited in any fashion except by written agreement signed by both parties hereto, which specifically states that it is modifying, amending or terminating this RCA.

6.2.   The rights and remedies of the Restricted Group under this RCA shall inure to the benefit of any and all of its/their successors, assigns, parent companies, sister companies, subsidiaries and other affiliated corporations, and the successors and assigns of each of them.

6.3.   The waiver by either party of any breach of this RCA shall not operate or be construed as a waiver of that party's rights on any subsequent breach.

6.4.   The Associate acknowledges that the Award constitutes adequate consideration to support the covenants and promises made by the Associate within this RCA regardless of whether such Award is ultimately beneficial to Associate.

6.5.   The Associate acknowledges and agrees that the Associate shall be obliged to draw the provisions of Section 3 of this RCA to the attention of any third party who may, at any time before or after the termination of the Associate's employment with Employer, offer to employ or engage him or her and for or with whom Associate intends to work within the Relevant Period.

6.6.   The various section headings contained in this RCA are for the purpose of convenience only and are not intended to define or limit the contents of such sections.

6.7.   This RCA may be executed in one or more counterparts, each of which shall constitute an original and all of which taken together shall constitute one and the same document. This RCA will be binding, notwithstanding that either party's signature is displayed only on a facsimile or electronic copy of the signature page.

6.8.   Any provisions which by their nature survive termination of this RCA, including the obligations set forth in Sections 3 and 4, shall survive termination of this RCA.

6.9.   This RCA has been executed on behalf of the Company electronically and the Associate accepts the electronic signature of the Company.

*By the Associate's execution or electronic acceptance of this RCA in the manner specified in the Associate's online account with the Company's designated broker/stock plan administrator, the Associate and the Company have agreed to the terms and conditions of this RCA in connection with the Associate's Award.*

**Signed for and on behalf of**
**Willis Towers Watson Public Limited Company by:**


Name:   Anne Donovan Bodnar
Title:   Chief Human Resources Officer


**Associate**:

Signature: **Signed Electronically**

Print Name: **PAUL D HERRIOTT**

## AGREEMENT OF RESTRICTIVE COVENANTS AND OTHER OBLIGATIONS FOR EMPLOYEES OUTSIDE OF THE UNITED STATES

This Agreement of Restrictive Covenants and Other Obligations for Employees Outside of the United States (the "Non-U.S. RCA") is entered into by and between Willis Towers Watson Public Limited Company (the "Company") and the Associate (the "Associate") to be effective as of the date the Associate signs or electronically accepts this Non-U.S. RCA.

## RECITALS

**Whereas**, Associate is employed by a Subsidiary of the Company;

**Whereas**, subject to approval by the Committee or the Company's Share Award Committee, the Associate has been designated to receive a grant of Phantom Stock Units ("Phantom Stock Units" or "Awards") under the Company's 2012 Equity Incentive Plan (the "Plan");

**Whereas**, any Award granted to the Associate is subject to the terms and conditions of the Plan, the award agreement evidencing the Associate's Award (including any country specific terms thereto) and this Non-U.S. RCA, and in consideration of the Award, the Associate shall enter into and acknowledge his or her agreement to the terms and conditions of the Plan, the award agreement and this RCA; and

**Whereas**, the Associate acknowledges and agrees that he or she desires to receive the Award and understands and agrees such Award is subject to the terms and conditions set forth in the applicable Plan, the award agreement and this Non-U.S. RCA and such other written agreements and documentation as the Company or the Employer may require.

**NOW, THEREFORE**, in consideration of the mutual covenants and promises contained herein and for other valuable consideration, in particular the Awards, the sufficiency of which is acknowledged in this recital and within Section 6.4 below, the parties hereby agree as follows:

Section 1  – Recitals

The Recitals set forth above are an integral part of this Non-U.S. RCA, and are incorporated herein by reference.

Section 2  – Definitions

2.1.  "**Award**" shall have the meaning as set forth in the recitals.

2.2.  "**Business**" shall mean insurance brokerage, reinsurance brokerage, surety brokerage, bond brokerage, insurance agency, underwriting agency, managing general agency, risk management, claims administration, self-insurance, risk management consulting or other business performed by the Restricted Group.

2.3.  "**Committee**" shall have the same meaning as set forth in the Plan or the applicable award agreement.

2.4.  "**Competitor**" shall mean any business principally engaged in insurance brokerage, reinsurance brokerage, surety brokerage, bond brokerage, insurance agency, underwriting agency, managing general agency, risk management, claims administration, self-insurance, risk management consulting or other business which is either performed by the Restricted Group or is a business in which the Restricted Group has taken steps toward engaging.  It is

further provided that Competitor includes, but is not limited to, the following businesses and their respective subsidiaries and/or other affiliates: Aon Corporation, Arthur J Gallagher & Co and Marsh Incorporated.

2.5.   "**Confidential Information**" shall mean all trade secrets and non-public information concerning the financial data, strategic business plans, and other non-public, proprietary, and confidential information of the Company or any of its Subsidiaries.

2.6.   "**directly or indirectly**" shall mean the Associate acting either alone or jointly with or on behalf of or by means of any other person, firm or company (whether as principal, partner, manager, employee, contractor, director, consultant, investor or similar capacity).

2.7.   "**Employer**" shall mean the Subsidiary that employs the Associate.  If the Company ever becomes an employer of the Associate, then the term Employer shall refer to the Company.

2.8.   "**Employment Agreement**" shall mean the contractual terms and conditions which govern the employment of the Associate by Employer.

2.9.   "**Garden Leave**" shall mean any period during any notice period where Employer requires the Associate to remain available to respond to questions and requests from the Employer, but not to enter into the office(s) of the Restricted Group without the prior written consent of Employer.

2.10.   "**Key Personnel**" shall mean any person who is at the date the Associate ceases to be an employee of Employer or was at any time during the period of twelve months prior to that date employed by the Restricted Group and who was an employee with whom the Associate had dealings other than in a minimal and non-material way and who was employed by or engaged in the Business in an executive or senior managerial capacity, or was an employee with insurance, reinsurance or other technical expertise.

2.11.   "**Plan**" shall have the meaning set forth in the recitals.

2.12.   "**Relevant Area**" shall mean: such country or countries in which the Associate has carried on Business on behalf of the Company or any of its Subsidiaries in which the Associate has been involved or concerned or worked on other than in a minimal and non-material way at any time during the period of 12 months prior to the date on which the Associate ceases to be employed by Employer.

2.13.   "**Relevant Client**" shall mean any person, firm or company who or which at any time during the period of twelve months prior to the date on which the Associate ceases to be employed by Employer is or was a client or customer of the Company or any of its Subsidiaries or was in the habit and/or practice of dealing under contract with the Company or any of its Subsidiaries and with whom or which the Associate had dealings related to the Business (other than in a minimal and non-material way) or for whose relationship with the Company or any of its Subsidiaries the Associate had responsibility at any time during the said period.

2.14.   "**Relevant Period**" shall mean the period of twelve months following the date on which the Associate ceases to be employed by Employer reduced by the length of any period of Garden Leave (if applicable) observed by the Associate at the instruction of Employer.

2.15.   "**Relevant Prospect**" shall mean any person, firm or company who or which at any time during the period of twelve months prior to the date on which the Associate ceases to be employed by Employer was an active prospective client of the Company or any of its

31

Subsidiaries with whom or with which the Associate had dealings related to the Business (other than in a minimal and non-material way).

2.16.    "**Restricted Group**" shall mean the Company and its Subsidiaries, as in existence during the Associate's employment with Employer and as of the date such employment ceases.

2.17.    "**Subsidiary**" shall mean a direct and/or indirect subsidiary of the Company as well as any associate company which is designated by the Company as being eligible for participation in the Plan.

Section 3  - Non-Solicit and Other Obligations

3.1      The Associate acknowledges that by virtue of his or her senior management position and as an employee of Employer, the Associate has acquired and will acquire knowledge of Confidential Information of the Restricted Group and their Business.  The Associate further acknowledges that the Confidential Information which the Restricted Group has provided and will provide to the Associate would give the Associate a significant advantage if the Associate were to directly or indirectly be engaged in any Business at a Competitor of the Restricted Group.

3.2      Without the Company's prior written consent, the Associate shall not directly or indirectly, at any time during or after the Associate's employment with any Employer, disclose any Confidential Information and shall use the Associate's best efforts to prevent the taking or disclosure of any Confidential Information, except as reasonably may be required to be disclosed by the Associate in the ordinary performance of his or her duties for Employer or as required by law.  Notwithstanding, you understand that if you make a confidential disclosure of a trade secret of the Company or other Confidential Information to a government official or an attorney for the sole purpose of reporting a suspected violation of law, or in a court filing under seal, or otherwise engage in activities protected under whistleblower statutes, you shall not be held liable under this Agreement or under any federal or state trade secret law for such a disclosure or engaging of such activity and shall also not be required to notify the Company of any such disclosure or engaging of any such activity.

3.3      The Associate shall provide a minimum of three months notice or such notice contained in the Associate's Employment Agreement, whichever is the longer, in the event of his or her resignation from employment with Employer. The Associate shall provide a written resignation letter to Employer prior to the commencement of any such notice period.  To the extent allowed by applicable law, the Associate may be placed on Garden Leave for all or any portion of any notice period. During the notice period, whether or not the Associate is on Garden Leave, the Associate shall remain an employee of Employer and shall continue to receive the Associate's full salary and benefits.  The Company or Employer shall have the discretion to apply a shorter period than the three-month period set forth in 3.3.

3.4      The Associate shall not, for the Relevant Period, directly or indirectly:

3.4.1.   within the Relevant Area, solicit any Relevant Client or Relevant Prospect for the purposes of any Business which competes or will compete or seeks to compete with the Restricted Group;

3.4.2.   within the Relevant Area, accept, perform services for, or deal with any Relevant Client or Relevant Prospect for the purposes of any Business which competes or will compete or seeks to compete with the Restricted Group;

32

3.4.3.  solicit for employment or entice away from the Restricted Group any Key Personnel; or

3.4.4.  employ or engage or endeavour to employ or engage any Key Personnel.

3.5  To the extent the Associate is a party to an Employment Agreement or other agreement with the Restricted Group that contains post-employment restrictions, those post-employment restrictions shall run concurrently with the post-employment restrictions contained in this Section 3.

3.6  The Associate acknowledges that the provisions of this Section 3 are fair, reasonable and necessary to protect the goodwill and interests of the Restricted Group.

Section 4  – <u>Non-Disparagement</u>

4.1  The Employer and Associate agree not to act in any manner detrimental to each other or cause to be made any derogatory statements concerning each other (including an obligation on the Employer and Associate not to make any statement whether oral or in writing which may have the effect of damaging the reputation of the other) including, in Associate's case, concerning the business, officers, employees, directors (including any non-executive directors or former directors), consultants, agents, distributors, clients or customers (whether former or current) or otherwise of the Restricted Group.

4.2  The Employer and Associate further agree that without the prior written consent of the other party they shall not make, or cause to be made, any statement or comment to the press (whether local, national or specialist) or any other media concerning Associate's employment with the Employer or, where applicable, his or her termination of employment for any reason.

Section 5  - <u>Governing Law & Jurisdiction</u>

5.1  This Non-U.S. RCA shall be governed by and construed in accordance with the laws of the jurisdiction in which Associate is employed by Employer, without regard to its conflict of laws.

5.2  The courts of the jurisdiction in which the Associate is employed by Employer shall have jurisdiction to hear any suit, action or proceeding and to settle any disputes which may arise out of or in connection with this Non-U.S. RCA and for such purposes the parties hereto irrevocably submit to the jurisdiction of such courts.

Section 6  – <u>Consideration, Severability, Beneficiaries & Effect on Other Agreements</u>

6.1  The Associate acknowledges that the covenants and undertakings he or she has made herein, including those made in Section 3, are being given for the benefit of the Restricted Group, including Employer, and may be enforced by the Company and/or by its Subsidiaries, including for avoidance of doubt, Employer, on behalf of all or any of them and that such Subsidiaries are intended beneficiaries of this Non-U.S. RCA.

6.2  The parties acknowledge that the provisions of this Non-U.S. RCA are severable.  If any part or provision of this Non-U.S. RCA shall be determined by any court or tribunal to be invalid, then such partial invalidity shall not cause the remainder of this Non-U.S. RCA to be or become invalid.  If any provision hereof is held unenforceable on the basis that it exceeds what is reasonable for the protection of the goodwill and interests of the Restricted Group, but would be valid if part of the wording were modified or deleted, as permitted by applicable

law, then such restriction or obligation shall apply with such deletions or modifications as may be necessary to make it enforceable.

6.3    The Associate acknowledges that he or she remains bound by any Employment Agreement or any other agreement entered into by the Associate with the Restricted Group and this Non-U.S. RCA shall be in addition to, and not in place of any such agreements.  The Associate further acknowledges that in the event of any breach by the Associate of any provision contained in such agreements or this Non-U.S. RCA, the Company and/or any Subsidiary, including for avoidance of doubt Employer, may, in their discretion, enforce any term and condition of those agreements and/or this Non-U.S. RCA.

6.4    The Associate acknowledges that any Awards, separately and/or together, constitute adequate consideration to support the covenants and promises made by the Associate within this Non-U.S. RCA.

Section 7  – <u>Miscellaneous</u>

7.1    This Non-U.S. RCA may not be modified except by written agreement signed by both parties hereto.

7.2    The rights of the Restricted Group under this Non-U.S. RCA shall inure to the benefit of any and all of its/their successors, assigns, parent companies, sister companies, subsidiaries and other affiliated corporations.

7.3    The waiver by either party of any breach of this Non-U.S. RCA shall not operate or be construed as a waiver of that party's rights on any subsequent breach.

7.4    The Associate acknowledges and agrees that the Associate shall be obliged to draw the provisions of Section 3 to the attention of any third party who may, at any time before or after the termination of the Associate's employment with Employer, offer to employ or engage him or her and for or with whom the Associate intends to work within the Relevant Period.

7.5    The various section headings contained in this Non-U.S. RCA are for the purpose of convenience only and are not intended to define or limit the contents of such sections.

7.6    This Non-U.S. RCA may be executed in one or more counterparts, each of which shall constitute an original and all of which taken together shall constitute one and the same document. This Non-U.S. RCA will be binding, notwithstanding that either party's signature is displayed only on a facsimile copy of the signature page.

7.7    Any provisions which by their nature survive termination of this Non-U.S. RCA, including the obligations set forth in Sections 3 and 4 shall survive termination of this Non-U.S. RCA.

*By the Associate's execution or electronic acceptance of this RCA in the manner specified in the Associate's online account with the Company's designated broker/stock plan administrator, the Associate and the Company have agreed to the terms and conditions of this RCA in connection with the Associate's Award.*

**Signed for and on behalf of**
**Willis Towers Watson Public Limited Company by:**


Name:   Anne Donovan Bodnar
Title:    Chief Human Resources Officer


**Associate**:

Signature: **Signed Electronically**

Print Name: **PAUL D HERRIOTT**


**IE34ZVXN**
**05/07/2018 08:39 AM U.S. Eastern Standard Time**
**ACCEPTED**

# EXHIBIT C

<u>**SCHEDULE C**</u>

**AGREEMENT OF RESTRICTIVE COVENANTS AND OTHER OBLIGATIONS FOR
EMPLOYEES IN THE UNITED STATES**

This Agreement of Restrictive Covenants and Other Obligations for Employees in the United States (the "<u>RCA</u>") is entered into by and between Willis Towers Watson Public Limited Company (the "<u>Company</u>") and the associate (the "<u>Associate</u>") to be effective as of the date the Associate signs or electronically accepts this RCA.

**RECITALS**

**Whereas**, Associate is employed by a Subsidiary of the Company;

**Whereas**, subject to approval by the Committee or the Company's Share Award Committee, the Associate has been designated to receive a grant of Phantom Stock Units ("<u>Phantom Stock Units</u>" or "<u>Awards</u>") under the Company's 2012 Equity Incentive Plan (the "<u>Plan</u>");

**Whereas**, any Award granted to the Associate is subject to the terms and conditions of the Plan, the award agreement evidencing the Associate's Award (including any country specific terms thereto) and this RCA, and in consideration of the Award, the Associate shall enter into and acknowledge his or her agreement to the terms and conditions of the Plan, the award agreement and this RCA; and

**Whereas**, the Associate acknowledges and agrees that he or she desires to receive the Award and understands and agrees any Award is subject to the terms and conditions set forth in the Plan, the applicable award agreement and this RCA.

**NOW, THEREFORE**, in consideration of the mutual covenants and promises contained herein and for other valuable consideration, in particular the Award, the receipt and sufficiency of which is hereby acknowledged in this recital and within Section 6.4 below, the Parties hereto agree, with the intent to be bound, as follows:

Section 1 - <u>Recitals</u>

The Recitals set forth above are an integral part of this RCA, and are incorporated herein by reference.

Section 2 - <u>Definitions</u>

2.1. "**Award**" shall have the meaning as set forth in the recitals.

2.2. "**Business**" shall mean insurance brokerage, reinsurance brokerage, surety brokerage, bond brokerage, insurance agency, underwriting agency, managing general agency, risk management, claims administration, self-insurance, risk management consulting or other business performed by the Restricted Group.

2.3. "**Committee**" shall have the same meaning as set forth in the Plan or the applicable award agreement.

2.4. "**Competitor**" shall mean any business principally engaged in insurance brokerage, reinsurance brokerage, surety brokerage, bond brokerage, insurance agency, underwriting agency, managing general agency, risk management, claims administration, self-insurance, risk management consulting or other business which is either performed by the Restricted Group or is a business in which the Restricted Group has taken steps toward engaging.

2.5.   "**Confidential Information**" shall mean all trade secrets and non-public information concerning the financial data, strategic business plans, and other non-public, proprietary, and confidential information of the Restricted Group.  Confidential Information  includes, but is not limited to, the following information:  identities of Relevant Clients and Relevant Prospects; identities of companies from which any Subsidiary obtains insurance coverage for Relevant Clients and Relevant Prospects; policy terms, conditions, rates and  expiration dates pertaining to Relevant Clients and Relevant Prospects; risk characteristics of Relevant Clients and Relevant Prospects; and non-public information of the Restricted Group concerning insurance markets for particular risks. Confidential Information shall not include information that is within public domain, provided that Associate was not responsible, directly or indirectly, for such information entering the public domain without the Restricted Group's consent.

2.6.   "**Directly or indirectly**" shall mean the Associate acting either alone or jointly with or on behalf of or by means of or in concert with any other person, firm or company (whether as principal, partner, manager, employee, contractor, director, consultant, investor or similar capacity) or otherwise.

2.7.   "**Employer**" shall mean the Subsidiary that employs the Associate.  If the Company ever becomes an employer of the Associate, then the term Employer shall refer to the Company.

2.8.   "**Employment Agreement**" shall mean the contractual terms and conditions which govern the employment of the Associate by Employer.

2.9.   "**Key Personnel**" shall mean any person who is at the date the Associate ceases to be an employee of Employer or was (i) at any time during the period of twelve (12) months prior to that date employed by the Restricted Group, (ii) an employee with whom Associate had dealings, and (iii) employed by or engaged in the Business in a managerial capacity, or was an employee with insurance, reinsurance or other technical expertise.

2.10.  "**Plan**" shall have the meaning set forth in the recitals.

2.11.  "**Relevant Area**" shall mean the counties, parishes, districts, municipalities, cities, metropolitan regions, localities and similar geographic and political subdivisions, within and outside of the United States of America, in which the Employer, the Company or any of its Subsidiaries has carried on Business in which the Associate has been involved or concerned or working on at any time during the period of twelve (12) months prior to the date on which the Associate ceases to be employed by Employer.

2.12.  "**Relevant Client**" shall mean any person, firm or company who or which at any time during the period of twelve (12) months prior to the date on which the Associate ceases to be employed by Employer is or was a client or customer of the Employer, the Company or any of its Subsidiaries or was in the habit and/or practice of dealing under contract with the Employer, the Company or any of its Subsidiaries and with whom or which the Associate had dealings related to the Business) or for whose relationship with the Employer, the Company or any of its Subsidiaries the Associate had responsibility at any time during the said period.

2.13.  "**Relevant Period**" shall mean the period of twenty four (24) months following the date on which the Associate ceases to be employed by Employer.

2.14.  "**Relevant Prospect**" shall mean any person, firm or company who or which at any time during the period of six (6) months prior to the date on which the Associate ceases to be employed by Employer was an active prospective client of the Employer, the Company or

any of its Subsidiaries with whom or with which the Associate had dealings related to the Business (other than in a minimal and non-material way).

2.15.   "**Restricted Group**" shall mean the Company and its Subsidiaries, including the Employer, as in existence during the Associate's employment with Employer and as of the date such employment ceases.

2.16.   "**Subsidiary**" shall mean a direct and/or indirect subsidiary of the Company as well as any associate company which is designated by the Company as being eligible for participation in the Plan.

Section 3  - <u>Non-Solicit and Other Obligations</u>

3.1.   The Associate acknowledges that by virtue of his or her management position and as an employee of Employer, the Associate has acquired and will acquire knowledge of Confidential Information of the Restricted Group and their Business.  The Associate further acknowledges that the Confidential Information which the Restricted Group has provided and will provide to the Associate would give the Associate a significant advantage if the Associate were to directly or indirectly be engaged in any Business at a Competitor of the Restricted Group.

3.2.   Without the Company's prior written consent, the Associate shall not directly or indirectly, at any time during or after the Associate's employment with any Employer, disclose any Confidential Information and shall use the Associate's best efforts to prevent the taking or disclosure of any Confidential Information to a Competitor, or otherwise, except as reasonably may be required to be disclosed by the Associate in the ordinary performance of his or her duties for Employer or as required by law.  Notwithstanding the foregoing, you understand that if you make a confidential disclosure of a trade secret of the Company or other Confidential Information to a government official or an attorney for the sole purpose of reporting a suspected violation of law, or in a court filing under seal, or otherwise engage in activities protected under whistleblower statutes, you shall not be held liable under this Agreement or under any federal or state trade secret law for such a disclosure or engaging of such activity and shall also not be required to notify the Company of any such disclosure or engaging of any such activity.

3.3.   The Associate shall not, for the Relevant Period, directly or indirectly for a Competitor or otherwise:

3.3.1.   within the Relevant Area, solicit any Relevant Client or Relevant Prospect for the purposes of any Business which competes or will compete or seeks to compete with the Restricted Group;

3.3.2.   within the Relevant Area, accept, perform services for, or deal with any Relevant Client or Relevant Prospect for the purposes of any Business which competes or will compete or seeks to compete with the Restricted Group;

3.3.3.   solicit for employment or entice away from the Restricted Group any Key Personnel; or

3.3.4.   employ or engage or endeavour to employ or engage any Key Personnel.

3.4.   To the extent the Associate is a party to an Employment Agreement or other agreement with the Employer, the Company or any Subsidiary that contains post-employment covenants and restrictions, those post-employment covenants and restrictions shall be separate and apart and independent from the covenants and restrictions set forth in Sections 3.2 and 3.3 herein.

3.5.     The Associate shall not directly or indirectly, at any time during or after the Associate's employment with any Employer, take any action or make any statement, written or oral, that disparages or criticizes the business or management of the Employer, the Company or any Subsidiary or any of its or their respective directors, officers, agents, employees, products or services. Nothing contained herein limits or restricts any rights Associate may have to engage in protected concerted activity under the National Labor Relations Act.

3.6.     The Associate recognizes and agrees that the payment of damages will not be an adequate remedy for any breach by Associate of any of the covenants set forth in Section 3 of this RCA.  Associate recognizes that irreparable injury will result to Company and/or its Subsidiaries in the event of any such breach and therefore Associate agrees that Company may, in addition to recovering damages, proceed in equity to enjoin Associate from violating any such covenant.

3.7.     The Associate acknowledges that the provisions of this Section 3 are fair, reasonable and necessary to protect the goodwill and interests of the Restricted Group.

Section 4  -  Governing Law & Jurisdiction

4.1.     This RCA shall be governed by and construed in accordance with the laws of the state of New York, without regard to its conflicts of law principles.

4.2.     Any suit, action or proceeding arising out of or relating to this RCA shall only be brought in the State and Federal Courts located in the County of New York, State of New York and the Parties hereto irrevocably and unconditionally submit accordingly to the exclusive jurisdiction of such courts for the purpose of any such suit, action or proceeding. The Associate hereby irrevocably and unconditionally waives any objections he or she may now have or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this RCA in the foregoing courts.  The Associate further acknowledges that for purposes of N.Y.C.P.L.R. 327(b) and  N.Y. G.O.L. Section 5-1402, the value of the Plan is in excess of One Million Dollars ($1,000,000) and the Associate hereby further irrevocably and unconditionally waives any claim that any such suit, action or proceeding brought in the foregoing courts has been brought in an inconvenient forum.

Section 5  -  Consideration, Severability, Beneficiaries &  Effect on other agreements

5.1.     The Parties acknowledge that the provisions of this RCA are severable.  If any part or provision of this RCA shall be determined by any court or tribunal to be invalid, then such partial invalidity shall not cause the remainder of this RCA to be or become invalid.  If any provision hereof is held unenforceable on the basis that it exceeds what is reasonable for the protection of the goodwill and interests of the Restricted Group, but would be valid if part of the wording were modified or deleted, as permitted by applicable law, then such restriction or obligation shall apply with such deletions or modifications as may be necessary to make it enforceable.

5.2.     The Associate acknowledges that he or she remains bound by any Employment Agreement or any other agreement currently in effect by and between the Associate, on the one hand,  and the Employer, the Company or any Subsidiary, on the other hand, including but not limited to any post-employment covenants and restrictions,  and this RCA shall be in addition to, and not in place of any such agreements.

27

5.3.   Nothing contained in this RCA constitutes a promise or agreement to employ the Associate for a guaranteed term or otherwise modify the terms and conditions of the Associate's employment with the Employer.

Section 6  – <u>Miscellaneous</u>

6.1.   This RCA, and the provisions hereof, may not be modified, amended, terminated, or limited in any fashion except by written agreement signed by both parties hereto, which specifically states that it is modifying, amending or terminating this RCA.

6.2.   The rights and remedies of the Restricted Group under this RCA shall inure to the benefit of any and all of its/their successors, assigns, parent companies, sister companies, subsidiaries and other affiliated corporations, and the successors and assigns of each of them.

6.3.   The waiver by either party of any breach of this RCA shall not operate or be construed as a waiver of that party's rights on any subsequent breach.

6.4.   The Associate acknowledges that the Award constitutes adequate consideration to support the covenants and promises made by the Associate within this RCA regardless of whether such Award is ultimately beneficial to Associate.

6.5.   The Associate acknowledges and agrees that the Associate shall be obliged to draw the provisions of Section 3 of this RCA to the attention of any third party who may, at any time before or after the termination of the Associate's employment with Employer, offer to employ or engage him or her and for or with whom Associate intends to work within the Relevant Period.

6.6.   The various section headings contained in this RCA are for the purpose of convenience only and are not intended to define or limit the contents of such sections.

6.7.   This RCA may be executed in one or more counterparts, each of which shall constitute an original and all of which taken together shall constitute one and the same document. This RCA will be binding, notwithstanding that either party's signature is displayed only on a facsimile or electronic copy of the signature page.

6.8.   Any provisions which by their nature survive termination of this RCA, including the obligations set forth in Sections 3 and 4, shall survive termination of this RCA.

6.9.   This RCA has been executed on behalf of the Company electronically and the Associate accepts the electronic signature of the Company.

*By the Associate's execution or electronic acceptance of this RCA in the manner specified in the Associate's online account with the Company's designated broker/stock plan administrator, the Associate and the Company have agreed to the terms and conditions of this RCA in connection with the Associate's Award.*

**Signed for and on behalf of**
**Willis Towers Watson Public Limited Company by:**


Name:   Anne Donovan Bodnar
Title:   Chief Human Resources Officer


**Associate**:

Signature: **Signed Electronically**

Print Name: **PAUL D HERRIOTT**

# EXHIBIT D

**AGREEMENT OF RESTRICTIVE COVENANTS AND OTHER OBLIGATIONS FOR EMPLOYEES IN THE UNITED STATES**

This Agreement of Restrictive Covenants and Other Obligations for Employees in the United States (the "RCA") is entered into by and between Willis Towers Watson Public Limited Company (the "Company") and the associate (the "Associate") to be effective as of the date the Associate signs or electronically accepts this RCA.

**RECITALS**

**Whereas**, Associate is employed by a Subsidiary of the Company;

**Whereas**, subject to approval by the Committee or the Company's Share Award Committee, the Associate has been designated to receive a grant of Phantom Stock Units ("Phantom Stock Units" or "Awards") under the Company's 2012 Equity Incentive Plan (the "Plan");

**Whereas**, any Award granted to the Associate is subject to the terms and conditions of the Plan, the award agreement evidencing the Associate's Award (including any country specific terms thereto) and this RCA, and in consideration of the Award, the Associate shall enter into and acknowledge his or her agreement to the terms and conditions of the Plan, the award agreement and this RCA; and

**Whereas**, the Associate acknowledges and agrees that he or she desires to receive the Award and understands and agrees any Award is subject to the terms and conditions set forth in the Plan, the applicable award agreement and this RCA.

**NOW, THEREFORE**, in consideration of the mutual covenants and promises contained herein and for other valuable consideration, in particular the Award, the receipt and sufficiency of which is hereby acknowledged in this recital and within Section 6.4 below, the Parties hereto agree, with the intent to be bound, as follows:

Section 1 - Recitals

The Recitals set forth above are an integral part of this RCA, and are incorporated herein by reference.

Section 2 - Definitions

2.1.    "**Award**" shall have the meaning as set forth in the recitals.

2.2.    "**Business**" shall mean insurance brokerage, reinsurance brokerage, surety brokerage, bond brokerage, insurance agency, underwriting agency, managing general agency, risk management, claims administration, self-insurance, risk management consulting or other business performed by the Restricted Group.

2.3.    "**Committee**" shall have the same meaning as set forth in the Plan or the applicable award agreement.

2.4.    "**Competitor**" shall mean any business principally engaged in insurance brokerage, reinsurance brokerage, surety brokerage, bond brokerage, insurance agency, underwriting agency, managing general agency, risk management, claims administration, self-insurance,

risk management consulting or other business which is either performed by the Restricted Group or is a business in which the Restricted Group has taken steps toward engaging.

2.5. "**Confidential Information**" shall mean all trade secrets and non-public information concerning the financial data, strategic business plans, and other non-public, proprietary, and confidential information of the Restricted Group. Confidential Information includes, but is not limited to, the following information: identities of Relevant Clients and Relevant Prospects; identities of companies from which any Subsidiary obtains insurance coverage for Relevant Clients and Relevant Prospects; policy terms, conditions, rates and expiration dates pertaining to Relevant Clients and Relevant Prospects; risk characteristics of Relevant Clients and Relevant Prospects; and non-public information of the Restricted Group concerning insurance markets for particular risks. Confidential Information shall not include information that is within public domain, provided that Associate was not responsible, directly or indirectly, for such information entering the public domain without the Restricted Group's consent.

2.6. "**Directly or indirectly**" shall mean the Associate acting either alone or jointly with or on behalf of or by means of or in concert with any other person, firm or company (whether as principal, partner, manager, employee, contractor, director, consultant, investor or similar capacity) or otherwise.

2.7. "**Employer**" shall mean the Subsidiary that employs the Associate. If the Company ever becomes an employer of the Associate, then the term Employer shall refer to the Company.

2.8. "**Employment Agreement**" shall mean the contractual terms and conditions which govern the employment of the Associate by Employer.

2.9. "**Key Personnel**" shall mean any person who is at the date the Associate ceases to be an employee of Employer or was (i) at any time during the period of twelve (12) months prior to that date employed by the Restricted Group, (ii) an employee with whom Associate had dealings, and (iii) employed by or engaged in the Business in a managerial capacity, or was an employee with insurance, reinsurance or other technical expertise.

2.10. "**Plan**" shall have the meaning set forth in the recitals.

2.11. "**Relevant Area**" shall mean the counties, parishes, districts, municipalities, cities, metropolitan regions, localities and similar geographic and political subdivisions, within and outside of the United States of America, in which the Employer, the Company or any of its Subsidiaries has carried on Business in which the Associate has been involved or concerned or working on at any time during the period of twelve (12) months prior to the date on which the Associate ceases to be employed by Employer.

2.12. "**Relevant Client**" shall mean any person, firm or company who or which at any time during the period of twelve (12) months prior to the date on which the Associate ceases to be employed by Employer is or was a client or customer of the Employer, the Company or any of its Subsidiaries or was in the habit and/or practice of dealing under contract with the Employer, the Company or any of its Subsidiaries and with whom or which the Associate had dealings related to the Business) or for whose relationship with the Employer, the Company or any of its Subsidiaries the Associate had responsibility at any time during the said period.

2.13. "**Relevant Period**" shall mean the period of twenty four (24) months following the date on which the Associate ceases to be employed by Employer.

2.14.   "**Relevant Prospect**" shall mean any person, firm or company who or which at any time during the period of six (6) months prior to the date on which the Associate ceases to be employed by Employer was an active prospective client of the Employer, the Company or any of its Subsidiaries with whom or with which the Associate had dealings related to the Business (other than in a minimal and non-material way).

2.15.   "**Restricted Group**" shall mean the Company and its Subsidiaries, including the Employer, as in existence during the Associate's employment with Employer and as of the date such employment ceases.

2.16.   "**Subsidiary**" shall mean a direct and/or indirect subsidiary of the Company as well as any associate company which is designated by the Company as being eligible for participation in the Plan.

Section 3  - <u>Non-Solicit and Other Obligations</u>

3.1.   The Associate acknowledges that by virtue of his or her management position and as an employee of Employer, the Associate has acquired and will acquire knowledge of Confidential Information of the Restricted Group and their Business.  The Associate further acknowledges that the Confidential Information which the Restricted Group has provided and will provide to the Associate would give the Associate a significant advantage if the Associate were to directly or indirectly be engaged in any Business at a Competitor of the Restricted Group.

3.2.   Without the Company's prior written consent, the Associate shall not directly or indirectly, at any time during or after the Associate's employment with any Employer, disclose any Confidential Information and shall use the Associate's best efforts to prevent the taking or disclosure of any Confidential Information to a Competitor, or otherwise, except as reasonably may be required to be disclosed by the Associate in the ordinary performance of his or her duties for Employer or as required by law.  Notwithstanding the foregoing, you understand that if you make a confidential disclosure of a trade secret of the Company or other Confidential Information to a government official or an attorney for the sole purpose of reporting a suspected violation of law, or in a court filing under seal, or otherwise engage in activities protected under whistleblower statutes, you shall not be held liable under this Agreement or under any federal or state trade secret law for such a disclosure or engaging of such activity and shall also not be required to notify the Company of any such disclosure or engaging of any such activity.

3.3.   The Associate shall not, for the Relevant Period, directly or indirectly for a Competitor or otherwise:

3.3.1.   within the Relevant Area, solicit any Relevant Client or Relevant Prospect for the purposes of any Business which competes or will compete or seeks to compete with the Restricted Group;

3.3.2.   within the Relevant Area, accept, perform services for, or deal with any Relevant Client or Relevant Prospect for the purposes of any Business which competes or will compete or seeks to compete with the Restricted Group;

3.3.3.   solicit for employment or entice away from the Restricted Group any Key Personnel; or

3.3.4.   employ or engage or endeavour to employ or engage any Key Personnel.

3.4.    To the extent the Associate is a party to an Employment Agreement or other agreement with the Employer, the Company or any Subsidiary that contains post-employment covenants and restrictions, those post-employment covenants and restrictions shall be separate and apart and independent from the covenants and restrictions set forth in Sections 3.2 and 3.3 herein.

3.5.    The Associate shall not directly or indirectly, at any time during or after the Associate's employment with any Employer, take any action or make any statement, written or oral, that disparages or criticizes the business or management of the Employer, the Company or any Subsidiary or any of its or their respective directors, officers, agents, employees, products or services. Nothing contained herein limits or restricts any rights Associate may have to engage in protected concerted activity under the National Labor Relations Act.

3.6.    The Associate recognizes and agrees that the payment of damages will not be an adequate remedy for any breach by Associate of any of the covenants set forth in Section 3 of this RCA.  Associate recognizes that irreparable injury will result to Company and/or its Subsidiaries in the event of any such breach and therefore Associate agrees that Company may, in addition to recovering damages, proceed in equity to enjoin Associate from violating any such covenant.

3.7.    The Associate acknowledges that the provisions of this Section 3 are fair, reasonable and necessary to protect the goodwill and interests of the Restricted Group.

Section 4  -  Governing Law & Jurisdiction

4.1.    This RCA shall be governed by and construed in accordance with the laws of the state of New York, without regard to its conflicts of law principles.

4.2.    Any suit, action or proceeding arising out of or relating to this RCA shall only be brought in the State and Federal Courts located in the County of New York, State of New York and the Parties hereto irrevocably and unconditionally submit accordingly to the exclusive jurisdiction of such courts for the purpose of any such suit, action or proceeding. The Associate hereby irrevocably and unconditionally waives any objections he or she may now have or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this RCA in the foregoing courts.  The Associate further acknowledges that for purposes of N.Y.C.P.L.R. 327(b) and  N.Y. G.O.L. Section 5-1402, the value of the Plan is in excess of One Million Dollars ($1,000,000) and the Associate hereby further irrevocably and unconditionally waives any claim that any such suit, action or proceeding brought in the foregoing courts has been brought in an inconvenient forum.

Section 5  -  Consideration, Severability, Beneficiaries &  Effect on other agreements

5.1.    The Parties acknowledge that the provisions of this RCA are severable.  If any part or provision of this RCA shall be determined by any court or tribunal to be invalid, then such partial invalidity shall not cause the remainder of this RCA to be or become invalid.  If any provision hereof is held unenforceable on the basis that it exceeds what is reasonable for the protection of the goodwill and interests of the Restricted Group, but would be valid if part of the wording were modified or deleted, as permitted by applicable law, then such restriction or obligation shall apply with such deletions or modifications as may be necessary to make it enforceable.

5.2.  The Associate acknowledges that he or she remains bound by any Employment Agreement or any other agreement currently in effect by and between the Associate, on the one hand,  and the Employer, the Company or any Subsidiary, on the other hand, including but not limited to any post-employment covenants and restrictions,  and this RCA shall be in addition to, and not in place of any such agreements.

5.3.  Nothing contained in this RCA constitutes a promise or agreement to employ the Associate for a guaranteed term or otherwise modify the terms and conditions of the Associate's employment with the Employer.

Section 6  – Miscellaneous

6.1.  This RCA, and the provisions hereof, may not be modified, amended, terminated, or limited in any fashion except by written agreement signed by both parties hereto, which specifically states that it is modifying, amending or terminating this RCA.

6.2.  The rights and remedies of the Restricted Group under this RCA shall inure to the benefit of any and all of its/their successors, assigns, parent companies, sister companies, subsidiaries and other affiliated corporations, and the successors and assigns of each of them.

6.3.  The waiver by either party of any breach of this RCA shall not operate or be construed as a waiver of that party's rights on any subsequent breach.

6.4.  The Associate acknowledges that the Award constitutes adequate consideration to support the covenants and promises made by the Associate within this RCA regardless of whether such Award is ultimately beneficial to Associate.

6.5.  The Associate acknowledges and agrees that the Associate shall be obliged to draw the provisions of Section 3 of this RCA to the attention of any third party who may, at any time before or after the termination of the Associate's employment with Employer, offer to employ or engage him or her and for or with whom Associate intends to work within the Relevant Period.

6.6.  The various section headings contained in this RCA are for the purpose of convenience only and are not intended to define or limit the contents of such sections.

6.7.  This RCA may be executed in one or more counterparts, each of which shall constitute an original and all of which taken together shall constitute one and the same document. This RCA will be binding, notwithstanding that either party's signature is displayed only on a facsimile or electronic copy of the signature page.

6.8.  Any provisions which by their nature survive termination of this RCA, including the obligations set forth in Sections 3 and 4, shall survive termination of this RCA.

6.9.  This RCA has been executed on behalf of the Company electronically and the Associate accepts the electronic signature of the Company.

C-5

*By the Associate's execution or electronic acceptance of this RCA in the manner specified in the Associate's online account with the Company's designated broker/stock plan administrator, the Associate and the Company have agreed to the terms and conditions of this RCA in connection with the Associate's Award.*

**Signed for and on behalf of**
**Willis Towers Watson Public Limited Company by:**

Name:   Anne Donovan Bodnar
Title:    Chief Human Resources Officer


**Associate**:

Signature:  _____

Print Name:  _____

# EXHIBIT E

<u>**SCHEDULE B**</u>

**AGREEMENT OF RESTRICTIVE COVENANTS AND OTHER OBLIGATIONS FOR
EMPLOYEES IN THE UNITED STATES**

This Agreement of Restrictive Covenants and Other Obligations for Employees in the United States (the "<u>RCA</u>") is entered into by and between Willis Towers Watson Public Limited Company (the "<u>Company</u>") and the participant (the "<u>Colleague</u>") to be effective as of the date the Colleague signs or electronically accepts this RCA.

**RECITALS**

**Whereas**, Colleague is employed by a Subsidiary of the Company;

**Whereas**, subject to approval by the Committee or the Company's Share Award Committee, the Colleague has been designated to receive a grant of performance-based restricted share units ("<u>PRSUs</u>" or "<u>Awards</u>") under the Company's 2012 Equity Incentive Plan (the "<u>Plan</u>");

**Whereas**, any Award granted to the Colleague is subject to the terms and conditions of the Plan, the award agreement evidencing the Colleague's Award (including any country specific terms thereto) and this RCA, and in consideration of the Award, the Colleague shall enter into and acknowledge his or her agreement to the terms and conditions of the Plan, the award agreement and this RCA; and

**Whereas**, the Colleague acknowledges and agrees that he or she desires to receive the Award and understands and agrees any Award is subject to the terms and conditions set forth in the Plan, the applicable award agreement and this RCA.

**NOW, THEREFORE**, in consideration of the mutual covenants and promises contained herein and for other valuable consideration, in particular the Award, the receipt and sufficiency of which is hereby acknowledged in this recital and within Section 6.4 below, the Parties hereto agree, with the intent to be bound, as follows:

Section 1 - <u>Recitals</u>

The Recitals set forth above are an integral part of this RCA, and are incorporated herein by reference.

Section 2 - <u>Definitions</u>

2.1.  "**Award**" shall have the meaning as set forth in the recitals.

2.2.  "**Business**" shall mean insurance brokerage, reinsurance brokerage, surety brokerage, bond brokerage, insurance agency, underwriting agency, managing general agency, risk management, claims administration, self-insurance, risk management consulting or other business performed by the Restricted Group.

2.3.  "**Committee**" shall have the same meaning as set forth in the Plan or the applicable award agreement.

2.4.  "**Competitor**" shall mean any business principally engaged in insurance brokerage, reinsurance brokerage, surety brokerage, bond brokerage, insurance agency, underwriting agency, managing general agency, risk management, claims administration, self-insurance, risk management consulting or other business which is either performed by the Restricted Group or is a business in which the Restricted Group has taken steps toward engaging.

2.5.     "**Confidential Information**" shall mean all trade secrets and non-public information concerning the financial data, strategic business plans, and other non-public, proprietary, and confidential information of the Restricted Group.  Confidential Information  includes, but is not limited to, the following information:  identities of Relevant Clients and Relevant Prospects; identities of companies from which any Subsidiary obtains insurance coverage for Relevant Clients and Relevant Prospects; policy terms, conditions, rates and  expiration dates pertaining to Relevant Clients and Relevant Prospects; risk characteristics of Relevant Clients and Relevant Prospects; and non-public information of the Restricted Group concerning insurance markets for particular risks. Confidential Information shall not include information that is within public domain, provided that Colleague was not responsible, directly or indirectly, for such information entering the public domain without the Restricted Group's consent.

2.6.     "**Directly or indirectly**" shall mean the Colleague acting either alone or jointly with or on behalf of or by means of or in concert with any other person, firm or company (whether as principal, partner, manager, employee, contractor, director, consultant, investor or similar capacity) or otherwise.

2.7.     "**Employer**" shall mean the Subsidiary that employs the Colleague.  If the Company ever becomes an employer of the Colleague, then the term Employer shall refer to the Company.

2.8.     "**Employment Agreement**" shall mean the contractual terms and conditions which govern the employment of the Colleague by Employer.

2.9.     "**Key Personnel**" shall mean any person who is at the date the Colleague ceases to be an employee of Employer or was (i) at any time during the period of twelve (12) months prior to that date employed by the Restricted Group, (ii) an employee with whom Colleague had dealings, and (iii) employed by or engaged in the Business in a managerial capacity, or was an employee with insurance, reinsurance or other technical expertise.

2.10.    "**Plan**" shall have the meaning set forth in the recitals.

2.11.    "**Relevant Area**" shall mean the counties, parishes, districts, municipalities, cities, metropolitan regions, localities and similar geographic and political subdivisions, within and outside of the United States of America, in which the Employer, the Company or any of its Subsidiaries has carried on Business in which the Colleague has been involved or concerned or working on at any time during the period of twelve (12) months prior to the date on which the Colleague ceases to be employed by Employer.

2.12.    "**Relevant Client**" shall mean any person, firm or company who or which at any time during the period of twelve (12) months prior to the date on which the Colleague ceases to be employed by Employer is or was a client or customer of the Employer, the Company or any of its Subsidiaries or was in the habit and/or practice of dealing under contract with the Employer, the Company or any of its Subsidiaries and with whom or which the Colleague had dealings related to the Business) or for whose relationship with the Employer, the Company or any of its Subsidiaries the Colleague had responsibility at any time during the said period.

2.13.    "**Relevant Period**" shall mean the period of twenty four (24) months following the date on which the Colleague ceases to be employed by Employer.

2.14.    "**Relevant Prospect**" shall mean any person, firm or company who or which at any time during the period of six (6) months prior to the date on which the Colleague ceases to be employed by Employer was an active prospective client of the Employer, the Company or

any of its Subsidiaries with whom or with which the Colleague had dealings related to the Business (other than in a minimal and non-material way).

2.15. "**Restricted Group**" shall mean the Company and its Subsidiaries, including the Employer, as in existence during the Colleague's employment with Employer and as of the date such employment ceases.

2.16. "**Subsidiary**" shall mean a direct and/or indirect subsidiary of the Company as well as any associate company which is designated by the Company as being eligible for participation in the Plan.

Section 3  - Non-Solicit and Other Obligations

3.1. The Colleague acknowledges that by virtue of his or her management position and as an employee of Employer, the Colleague has acquired and will acquire knowledge of Confidential Information of the Restricted Group and their Business.  The Colleague further acknowledges that the Confidential Information which the Restricted Group has provided and will provide to the Colleague would give the Colleague a significant advantage if the Colleague were to directly or indirectly be engaged in any Business at a Competitor of the Restricted Group.

3.2. Without the Company's prior written consent, the Colleague shall not directly or indirectly, at any time during or after the Colleague's employment with any Employer, disclose any Confidential Information and shall use the Colleague's best efforts to prevent the taking or disclosure of any Confidential Information to a Competitor, or otherwise, except as reasonably may be required to be disclosed by the Colleague in the ordinary performance of his or her duties for Employer or as required by law.  Notwithstanding the foregoing, you understand that if you make a confidential disclosure of a trade secret of the Company or other Confidential Information to a government official or an attorney for the sole purpose of reporting a suspected violation of law, or in a court filing under seal, or otherwise engage in activities protected under whistleblower statutes, you shall not be held liable under this Agreement or under any federal or state trade secret law for such a disclosure or engaging of such activity and shall also not be required to notify the Company of any such disclosure or engaging of any such activity.

3.3. The Colleague shall not, for the Relevant Period, directly or indirectly for a Competitor or otherwise:

3.3.1. within the Relevant Area, solicit any Relevant Client or Relevant Prospect for the purposes of any Business which competes or will compete or seeks to compete with the Restricted Group;

3.3.2. within the Relevant Area, accept, perform services for, or deal with any Relevant Client or Relevant Prospect for the purposes of any Business which competes or will compete or seeks to compete with the Restricted Group;

3.3.3. solicit for employment or entice away from the Restricted Group any Key Personnel; or

3.3.4. employ or engage or endeavour to employ or engage any Key Personnel.

3.4. To the extent the Colleague is a party to an Employment Agreement or other agreement with the Employer, the Company or any Subsidiary that contains post-employment covenants and restrictions, those post-employment covenants and restrictions shall be separate and apart and

independent from the covenants and restrictions set forth in Section 3.2 and Section 3.4 herein.

3.5.     The Colleague shall not directly or indirectly, at any time during or after the Colleague's employment with any Employer, take any action or make any statement, written or oral, that disparages or criticizes the business or management of the Employer, the Company or any Subsidiary or any of its or their respective directors, officers, agents, employees, products or services. Nothing contained herein limits or restricts any rights Colleague may have to engage in protected concerted activity under the National Labor Relations Act.

3.6.     The Colleague recognizes and agrees that the payment of damages will not be an adequate remedy for any breach by Colleague of any of the covenants set forth in Section 3 of this RCA.  Colleague recognizes that irreparable injury will result to Company and/or its Subsidiaries in the event of any such breach and therefore Colleague agrees that Company may, in addition to recovering damages, proceed in equity to enjoin Colleague from violating any such covenant.

3.7.     The Colleague acknowledges that the provisions of this Section 3 are fair, reasonable and necessary to protect the goodwill and interests of the Restricted Group.

Section 4  -  Governing Law & Jurisdiction

4.1.     This RCA shall be governed by and construed in accordance with the laws of the state of New York, without regard to its conflicts of law principles.

4.2.     Any suit, action or proceeding arising out of or relating to this RCA shall only be brought in the State and Federal Courts located in the County of New York, State of New York and the Parties hereto irrevocably and unconditionally submit accordingly to the exclusive jurisdiction of such courts for the purpose of any such suit, action or proceeding. The Colleague hereby irrevocably and unconditionally waives any objections he or she may now have or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this RCA in the foregoing courts.  The Colleague further acknowledges that for purposes of N.Y.C.P.L.R. 327(b) and  N.Y. G.O.L. Section 5-1402, the value of the Plan is in excess of One Million Dollars ($1,000,000) and the Colleague hereby further irrevocably and unconditionally waives any claim that any such suit, action or proceeding brought in the foregoing courts has been brought in an inconvenient forum.

Section 5  -  Consideration, Severability, Beneficiaries & Effect on other agreements

5.1.     The Parties acknowledge that the provisions of this RCA are severable.  If any part or provision of this RCA shall be determined by any court or tribunal to be invalid, then such partial invalidity shall not cause the remainder of this RCA to be or become invalid.  If any provision hereof is held unenforceable on the basis that it exceeds what is reasonable for the protection of the goodwill and interests of the Restricted Group, but would be valid if part of the wording were modified or deleted, as permitted by applicable law, then such restriction or obligation shall apply with such deletions or modifications as may be necessary to make it enforceable.

5.2.     The Colleague acknowledges that he or she remains bound by any Employment Agreement or any other agreement currently in effect by and between the Colleague, on the one hand, and the Employer, the Company or any Subsidiary, on the other hand, including but not

limited to any post-employment covenants and restrictions, and this RCA shall be in addition to, and not in place of any such agreements.

5.3.    Nothing contained in this RCA constitutes a promise or agreement to employ the Colleague for a guaranteed term or otherwise modify the terms and conditions of the Colleague's employment with the Employer.

Section 6  – <u>Miscellaneous</u>

6.1.    This RCA, and the provisions hereof, may not be modified, amended, terminated, or limited in any fashion except by written agreement signed by both parties hereto, which specifically states that it is modifying, amending or terminating this RCA.

6.2.    The rights and remedies of the Restricted Group under this RCA shall inure to the benefit of any and all of its/their successors, assigns, parent companies, sister companies, subsidiaries and other affiliated corporations, and the successors and assigns of each of them.

6.3.    The waiver by either party of any breach of this RCA shall not operate or be construed as a waiver of that party's rights on any subsequent breach.

6.4.    The Colleague acknowledges that the Award constitutes adequate consideration to support the covenants and promises made by the Colleague within this RCA regardless of whether such Award is ultimately beneficial to Colleague.

6.5.    The Colleague acknowledges and agrees that the Colleague shall be obliged to draw the provisions of Section 3 of this RCA to the attention of any third party who may, at any time before or after the termination of the Colleague's employment with Employer, offer to employ or engage him or her and for or with whom Colleague intends to work within the Relevant Period.

6.6.    The various section headings contained in this RCA are for the purpose of convenience only and are not intended to define or limit the contents of such sections.

6.7.    This RCA may be executed in one or more counterparts, each of which shall constitute an original and all of which taken together shall constitute one and the same document. This RCA will be binding, notwithstanding that either party's signature is displayed only on a facsimile or electronic copy of the signature page.

6.8.    Any provisions which by their nature survive termination of this RCA, including the obligations set forth in Section 3 and Section 4, shall survive termination of this RCA.

6.9.    This RCA has been executed on behalf of the Company electronically and the Colleague accepts the electronic signature of the Company.

*By the Colleague's execution or electronic acceptance of this RCA in the manner specified in the Colleague's online account with the Company's designated broker/stock plan administrator, the Colleague and the Company have agreed to the terms and conditions of this RCA in connection with the Colleague's Award.*

**Signed for and on behalf of
Willis Towers Watson Public Limited Company by:**


Name:   Anne Donovan Bodnar
Title:    Chief Administrative Officer and Head of Human Resources

**Colleague**:

Signature: **Signed Electronically**

Print Name: **PAUL D HERRIOTT**


05/08/2020

**SCHEDULE C**

## AGREEMENT OF RESTRICTIVE COVENANTS AND OTHER OBLIGATIONS FOR EMPLOYEES OUTSIDE OF THE UNITED STATES

This Agreement of Restrictive Covenants and Other Obligations for Employees Outside of the United States (the "Non-U.S. RCA") is entered into by and between Willis Towers Watson Public Limited Company (the "Company") and the Colleague (the "Colleague") to be effective as of the date the Colleague signs or electronically accepts this Non-U.S. RCA.

### RECITALS

**Whereas**, Colleague is employed by a Subsidiary of the Company;

**Whereas**, subject to approval by the Committee or the Company's Share Award Committee, the Colleague has been designated to receive a grant of performance-based restricted share units ("PRSUs" or "Awards") under the Company's 2012 Equity Incentive Plan (the "Plan");

**Whereas**, any Award granted to the Colleague is subject to the terms and conditions of the Plan, the award agreement evidencing the Colleague's Award (including any country specific terms thereto) and this Non-U.S. RCA, and in consideration of the Award, the Colleague shall enter into and acknowledge his or her agreement to the terms and conditions of the Plan, the award agreement and this RCA; and

**Whereas**, the Colleague acknowledges and agrees that he or she desires to receive the Award and understands and agrees such Award is subject to the terms and conditions set forth in the Plan, the applicable award agreement and this Non-U.S. RCA, and such other written agreements and documentation as the Company or the Employer may require.

**NOW, THEREFORE**, in consideration of the mutual covenants and promises contained herein and for other valuable consideration, in particular the Awards, the receipt and sufficiency of which is hereby acknowledged in this recital and within Section 6.4 below, the Parties hereto agree, with the intent to be bound, as follows:

Section 1  – Recitals

The Recitals set forth above are an integral part of this Non-U.S. RCA, and are incorporated herein by reference.

Section 2  – Definitions

2.1.    "**Award**" shall have the meaning as set forth in the recitals.

2.2.    "**Business**" shall mean insurance brokerage, reinsurance brokerage, surety brokerage, bond brokerage, insurance agency, underwriting agency, managing general agency, risk management, claims administration, self-insurance, risk management consulting or other business performed by the Restricted Group.

2.3.    "**Committee**" shall have the same meaning as set forth in the Plan or the applicable award agreement.

2.4.  "**Competitor**" shall mean any business principally engaged in insurance brokerage, reinsurance brokerage, surety brokerage, bond brokerage, insurance agency, underwriting agency, managing general agency, risk management, claims administration, self-insurance, risk management consulting or other business which is either performed by the Restricted Group or is a business in which the Restricted Group has taken steps toward engaging.

2.5.  "**Confidential Information**" shall mean all trade secrets and non-public information concerning the financial data, strategic business plans, and other non-public, proprietary, and confidential information of the Restricted Group.  Confidential Information  includes, but is not limited to, the following information:  identities of Relevant Clients and Relevant Prospects; identities of companies from which any Subsidiary obtains insurance coverage for Relevant Clients and Relevant Prospects; policy terms, conditions, rates and  expiration dates pertaining to Relevant Clients and Relevant Prospects; risk characteristics of Relevant Clients and Relevant Prospects; and non-public information of the Restricted Group concerning insurance markets for particular risks. Confidential Information shall not include information that is within public domain, provided that Colleague was not responsible, directly or indirectly, for such information entering the public domain without the Restricted Group's consent.

2.6.  "**Directly or indirectly**" shall mean the Colleague acting either alone or jointly with or on behalf of or by means of any other person, firm or company (whether as principal, partner, manager, employee, contractor, director, consultant, investor or similar capacity).

2.7.  "**Employer**" shall mean the Subsidiary that employs the Colleague.  If the Company ever becomes an employer of the Colleague, then the term Employer shall refer to the Company.

2.8.  "**Employment Agreement**" shall mean the contractual terms and conditions which govern the employment of the Colleague by Employer.

2.9.  "**Garden Leave**" shall mean any period during any notice period where Employer requires the Colleague to remain available to respond to questions and requests from the Employer, but not to enter into the office(s) of the Restricted Group without the prior written consent of Employer.

2.10.  "**Key Personnel**" shall mean any person who is at the date the Colleague ceases to be an employee of Employer or was at any time during the period of twelve months prior to that date employed by the Restricted Group and who was an employee with whom the Colleague had dealings other than in a minimal and non-material way and who was employed by or engaged in the Business in an executive or senior managerial capacity, or was an employee with insurance, reinsurance or other technical expertise.

2.11.  "**Plan**" shall have the meaning set forth in the recitals.

2.12.  "**Relevant Area**" shall mean: such country or countries in which the Colleague has carried on Business on behalf of the Company or any of its Subsidiaries in which the Colleague has been involved or concerned or worked on other than in a minimal and non-material way at any time during the period of 12 months prior to the date on which the Colleague ceases to be employed by Employer.

2.13.  "**Relevant Client**" shall mean any person, firm or company who or which at any time during the period of twelve months prior to the date on which the Colleague ceases to be employed by Employer is or was a client or customer of the Company or any of its Subsidiaries or was in the habit and/or practice of dealing under contract with the Company or any of its

Subsidiaries and with whom or which the Colleague had dealings related to the Business (other than in a minimal and non-material way) or for whose relationship with the Company or any of its Subsidiaries the Colleague had responsibility at any time during the said period.

2.14.   "**Relevant Period**" shall mean the period of twelve months following the date on which the Colleague ceases to be employed by Employer reduced by the length of any period of Garden Leave (if applicable) observed by the Colleague at the instruction of Employer.

2.15.   "**Relevant Prospect**" shall mean any person, firm or company who or which at any time during the period of twelve months prior to the date on which the Colleague ceases to be employed by Employer was an active prospective client of the Company or any of its Subsidiaries with whom or with which the Colleague had dealings related to the Business (other than in a minimal and non-material way).

2.16.   "**Restricted Group**" shall mean the Company and its Subsidiaries, as in existence during the Colleague's employment with Employer and as of the date such employment ceases.

2.17.   "**Subsidiary**" shall mean a direct and/or indirect subsidiary of the Company as well as any associate company which is designated by the Company as being eligible for participation in the Plan.

Section 3  - <u>Non-Solicit and Other Obligations</u>

3.1     The Colleague acknowledges that by virtue of his or her senior management position and as an employee of Employer, the Colleague has acquired and will acquire knowledge of Confidential Information of the Restricted Group and their Business. The Colleague further acknowledges that the Confidential Information which the Restricted Group has provided and will provide to the Colleague would give the Colleague a significant advantage if the Colleague were to directly or indirectly be engaged in any Business at a Competitor of the Restricted Group.

3.2   Without the Company's prior written consent, the Colleague shall not directly or indirectly, at any time during or after the Colleague's employment with any Employer, disclose any Confidential Information and shall use the Colleague's best efforts to prevent the taking or disclosure of any Confidential Information, except as reasonably may be required to be disclosed by the Colleague in the ordinary performance of his or her duties for Employer or as required by law. Notwithstanding, you understand that if you make a confidential disclosure of a trade secret of the Company or other Confidential Information to a government official or an attorney for the sole purpose of reporting a suspected violation of law, or in a court filing under seal, or otherwise engage in activities protected under whistleblower statutes, you shall not be held liable under this Agreement or under any federal or state trade secret law for such a disclosure or engaging of such activity and shall also not be required to notify the Company of any such disclosure or engaging of any such activity.

3.3     The Colleague shall provide a minimum of three months notice or such notice contained in the Colleague's Employment Agreement, whichever is the longer, in the event of his or her resignation from employment with Employer. The Colleague shall provide a written resignation letter to Employer prior to the commencement of any such notice period. To the extent allowed by applicable law, the Colleague may be placed on Garden Leave for all or any portion of any notice period. During the notice period, whether or not the Colleague is on Garden Leave, the Colleague shall remain an employee of Employer and shall continue to

receive the Colleague's full salary and benefits.  The Company or Employer shall have the discretion to apply a shorter period than the three-month period set forth in 3.3.

3.4     The Colleague shall not, for the Relevant Period, directly or indirectly:

    3.4.1.   within the Relevant Area, solicit any Relevant Client or Relevant Prospect for the purposes of any Business which competes or will compete or seeks to compete with the Restricted Group;

    3.4.2.   within the Relevant Area, accept, perform services for, or deal with any Relevant Client or Relevant Prospect for the purposes of any Business which competes or will compete or seeks to compete with the Restricted Group;

    3.4.3.   solicit for employment or entice away from the Restricted Group any Key Personnel; or

    3.4.4.   employ or engage or endeavour to employ or engage any Key Personnel.

3.5     To the extent the Colleague is a party to an Employment Agreement or other agreement with the Restricted Group that contains post-employment restrictions, those post-employment restrictions shall run concurrently with the post-employment restrictions contained in this Section 3.

3.6     The Colleague acknowledges that the provisions of this Section 3 are fair, reasonable and necessary to protect the goodwill and interests of the Restricted Group.

Section 4  – Non-Disparagement

4.1     The Employer and Colleague agree not to act in any manner detrimental to each other or cause to be made any derogatory statements concerning each other (including an obligation on the Employer and Colleague not to make any statement whether oral or in writing which may have the effect of damaging the reputation of the other) including, in Colleague's case, concerning the business, officers, employees, directors (including any non-executive directors or former directors), consultants, agents, distributors, clients or customers (whether former or current) or otherwise of the Restricted Group.

4.2     The Employer and Colleague further agree that without the prior written consent of the other party they shall not make, or cause to be made, any statement or comment to the press (whether local, national or specialist) or any other media concerning Colleague's employment with the Employer or, where applicable, his or her termination of employment for any reason.

Section 5  - Governing Law & Jurisdiction

5.1     This Non-U.S. RCA shall be governed by and construed in accordance with the laws of the jurisdiction in which Colleague is employed by Employer, without regard to its conflict of laws.

5.2     The courts of the jurisdiction in which the Colleague is employed by Employer shall have jurisdiction to hear any suit, action or proceeding and to settle any disputes which may arise out of or in connection with this Non-U.S. RCA and for such purposes the parties hereto irrevocably submit to the jurisdiction of such courts.

Section 6  – <u>Consideration, Severability, Beneficiaries & Effect on Other Agreements</u>

6.1     The Colleague acknowledges that the covenants and undertakings he or she has made herein, including those made in Section 3, are being given for the benefit of the Restricted Group, including Employer, and may be enforced by the Company and/or its Subsidiaries, including for avoidance of doubt, Employer, on behalf of all or any of them and that such Subsidiaries are intended beneficiaries of this Non-U.S. RCA.

6.2     The parties acknowledge that the provisions of this Non-U.S. RCA are severable.  If any part or provision of this Non-U.S. RCA shall be determined by any court or tribunal to be invalid, then such partial invalidity shall not cause the remainder of this Non-U.S. RCA to be or become invalid.  If any provision hereof is held unenforceable on the basis that it exceeds what is reasonable for the protection of the goodwill and interests of the Restricted Group, but would be valid if part of the wording were modified or deleted, as permitted by applicable law, then such restriction or obligation shall apply with such deletions or modifications as may be necessary to make it enforceable.

6.3     The Colleague acknowledges that he or she remains bound by any Employment Agreement or any other agreement entered into by the Colleague with the Restricted Group and this Non-U.S. RCA shall be in addition to, and not in place of any such agreements.  The Colleague further acknowledges that in the event of any breach by the Colleague of any provision contained in such agreements or this Non-U.S. RCA, the Company and/or any Subsidiary, including for avoidance of doubt Employer, may, in their discretion, enforce any term and condition of those agreements and/or this Non-U.S. RCA.

6.4     The Colleague acknowledges that any Awards, separately and/or together, constitute adequate consideration to support the covenants and promises made by the Colleague within this Non-U.S. RCA.

Section 7  – <u>Miscellaneous</u>

7.1     This Non-U.S. RCA may not be modified except by written agreement signed by both parties hereto.

7.2     The rights of the Restricted Group under this Non-U.S. RCA shall inure to the benefit of any and all of its/their successors, assigns, parent companies, sister companies, subsidiaries and other affiliated corporations.

7.3     The waiver by either party of any breach of this Non-U.S. RCA shall not operate or be construed as a waiver of that party's rights on any subsequent breach.

7.4     The Colleague acknowledges and agrees that the Colleague shall be obliged to draw the provisions of Section 3 to the attention of any third party who may, at any time before or after the termination of the Colleague's employment with Employer, offer to employ or engage him or her and for or with whom the Colleague intends to work within the Relevant Period.

7.5     The various section headings contained in this Non-U.S. RCA are for the purpose of convenience only and are not intended to define or limit the contents of such sections.

7.6     This Non-U.S. RCA may be executed in one or more counterparts, each of which shall constitute an original and all of which taken together shall constitute one and the same document. This Non-U.S. RCA will be binding, notwithstanding that either party's signature is displayed only on a facsimile copy of the signature page.

7.7     Any provisions which by their nature survive termination of this Non-U.S. RCA, including the obligations set forth in Sections 3 and 4 shall survive termination of this Non-U.S. RCA.

***By the Colleague's execution or electronic acceptance of this RCA in the manner specified in the Colleague's online account with the Company's designated broker/stock plan administrator, the Colleague and the Company have agreed to the terms and conditions of this RCA in connection with the Colleague's Award.***

**Signed for and on behalf of**
**Willis Towers Watson Public Limited Company by:**


Name:   Anne Donovan Bodnar
Title:    Chief Administrative Officer and Head of Human Resources

**Colleague**:

Signature:  _____

Print Name:  _____


**KE47Y8B0**

**05/08/2020 01:35 PM U.S. Eastern Standard Time**

**ACCEPTED**

C-6

1   JODI S. COHEN, CASB No. 151534
    jodi.cohen@kyl.com
2   CHRISTOPHER A. STECHER, CASB No. 215329
    christopher.stecher@kyl.com
3   TERESA J. THONG, CASB No. 328666
    teresa.thong@kyl.com
4   KEESAL, YOUNG & LOGAN
    A Professional Corporation
5   450 Pacific Avenue
    San Francisco, California 94133
6   Telephone:    (415) 398-6000
    Facsimile:    (415) 981-0136
7
    SCOTT H. CASHER (*pro hac vice* application to be filed)
8   cashers@whiteandwilliams.com
    WHITE AND WILLIAMS LLP
9   Times Square Tower
    7 Times Square, Suite 2900
10  New York, New York 10036
    Telephone:    (914) 487-7343
11  Facsimile:    (914) 487-7328

12  Attorneys for Defendants
    WILLIS RE INC. and WILLIS TOWERS
13  WATSON PUBLIC LIMITED COMPANY

14

15                  **UNITED STATES DISTRICT COURT**

16                  **NORTHERN DISTRICT OF CALIFORNIA**

17  PAUL HERRIOTT, an individual and California )   Case No. 3:21-cv-588
    resident, and TIGERRISK PARTNERS LLC, a    )
18  Delaware limited liability company,        )   **NOTICE OF FILING OF REMOVAL OF**
                                               )   **ACTION PURSUANT TO 28 U.S.C. §§ 1332,**
19                               Plaintiffs,   )   **1441(A), AND 1446**
                                               )
20              vs.                            )   **[DIVERSITY JURISDICTION]**
                                               )
21  WILLIS RE INC, a New York corporation and  )
    WILLIS TOWERS WATSON PUBLIC                 )
22  LIMITED COMPANY, an Irish public limited   )
    company, and Does 1-50                      )
23                                             )
                                 Defendants.   )
24  _____   )

25

26  ///

27

28  ///

                                        - 1 -
    NOTICE OF FILING OF REMOVAL OF ACTION PURSUANT TO 28 U.S.C. §§ 1332, 1441(A),
    AND 1446 - Case No. 3:21-cv-588
    KYL4822-1120-8153.1

1    **TO PLAINTIFFS PAUL HERRIOTT, TIGERRISK PARTNERS LLC AND THEIR**

2    **ATTORNEYS OF RECORD:**

3               PLEASE TAKE NOTICE that on January 25, 2021, Defendants WILLIS RE INC. and

4    WILLIS TOWERS WATSON PUBLIC LIMITED COMPANY (collectively, "Defendants") filed in

5    the United States District Court, Northern District of California, a Notice of Filing of Removal of the

6    above-entitled action to the United States District Court from the Superior Court of the State of

7    California for the County of San Francisco pursuant to 28 U.S.C. §§ 1332, 1441(a), and 1446.

8               PLEASE TAKE FURTHER NOTICE that, on January 25, 2021, Defendants filed a

9    Notice of Filing of Removal and Removal of Action to Federal Court, together with a copy of the

10   Notice of Removal, with the Clerk of the Superior Court of the State of California for the County of

11   San Francisco.  A true and correct copy of the Notice is attached hereto as Exhibit A.

12

13

14

15   DATED:  January 25, 2021

16                                          JODI S. COHEN

                                       CHRISTOPHER A. STECHER

17                                      TERESA J. THONG

                                     KEESAL, YOUNG & LOGAN

18                                      Attorneys for Defendants

                                     WILLIS RE INC. and WILLIS TOWERS

19                                      WATSON PUBLIC LIMITED COMPANY

20

21

22

23

24

25

26

27

28

NOTICE OF FILING OF REMOVAL OF ACTION PURSUANT TO 28 U.S.C. §§ 1332, 1441(A),
AND 1446 - Case No. 3:21-cv-588

# EXHIBIT A

1    JODI S. COHEN, CASB No. 151534
     jodi.cohen@kyl.com
2    CHRISTOPHER A. STECHER, CASB No. 215329
     christopher.stecher@kyl.com
3    TERESA J. THONG, CASB No. 328666
     teresa.thong@kyl.com
4    KEESAL, YOUNG & LOGAN
     A Professional Corporation
5    450 Pacific Avenue
     San Francisco, California 94133
6    Telephone:    (415) 398-6000
     Facsimile:    (415) 981-0136
7
     Attorneys for Defendants
8    WILLIS RE INC. and WILLIS TOWERS
     WATSON PUBLIC LIMITED COMPANY
9

10              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11                 **FOR THE COUNTY OF SAN FRANCISCO**

12

13   PAUL HERRIOTT, an individual and California  )   Case No. CGC-21-589171
     resident, and                                )
14   TIGERRISK PARTNERS LLC, a Delaware           )   *Action Filed: January 22, 2021*
     limited liability company,                   )
15                                                )   **DEFENDANTS WILLIS RE INC. AND**
                                    Plaintiffs,   )   **WILLIS TOWERS WATSON PUBLIC**
16                                                )   **LIMITED COMPANY'S NOTICE TO THE**
                     vs.                          )   **CLERK OF THE SUPERIOR COURT OF**
17                                                )   **THE FILING OF REMOVAL AND**
     WILLIS RE INC, a New York corporation and    )   **REMOVAL OF ACTION TO FEDERAL**
18   WILLIS TOWERS WATSON PUBLIC                   )   **COURT**
     LIMITED COMPANY, an Irish public limited     )
19   company, and                                 )   *ASSIGNED FOR ALL PURPOSES TO:*
     Does 1-50,                                    )   *Judge Samuel K Feng, Dept. 610*
20                                                )
                                    Defendants.   )
21   _____)

22

23   **TO THE CLERK OF THE SUPERIOR COURT OF CALIFORNIA FOR THE COUNTY OF**
     **SAN FRANCISCO:**
24

25              PLEASE TAKE NOTICE that Defendants WILLIS RE INC. and WILLIS TOWERS

26   WATSON PUBLIC LIMITED COMPANY (collectively, "Defendants") have removed the above-

27   entitled action to the United States District Court for the Northern District of California.  Attached

28   hereto as Exhibit "A" are true and correct copies of the Notice of Filing of Removal of Action, Notice

                                              - 1 -

1  of Removal, Declaration of Teresa J. Thong, Declaration of James Bradshaw, and Declaration of Scott

2  H. Casher, the originals of which have been filed in the United States District Court for the Northern

3  District of California in connection with the above-entitled action.

4          PLEASE TAKE FURTHER NOTICE that pursuant to 28 U.S.C. § 1446(d), the filing

5  of the attached Notice of Removal with the federal court effects removal of this action, and this Court

6  may proceed no further unless and until the case is remanded.

7

8

9  DATED:  January 25, 2021

10                JODI S. COHEN
              CHRISTOPHER A. STECHER

11                TERESA J. THONG
              KEESAL, YOUNG & LOGAN

12                Attorneys for Defendants
              WILLIS RE INC. and WILLIS TOWERS

13                WATSON PUBLIC LIMITED COMPANY

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' NOTICE TO THE CLERK OF THE SUPERIOR COURT OF THE FILING OF REMOVAL AND
REMOVAL OF ACTION TO FEDERAL COURT
KYL4834-1982-3321.1

Case Name: *Herriott, et al. v. Willis, et al.*
Case No.: CGC-21-589171
KYL File No.: 6189-125

1

## PROOF OF SERVICE

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3
    I am employed in the County of Los Angeles, State of California. I am over the age of 18 and
not a party to the within action; my business address is Keesal, Young & Logan, 400 Oceangate, Suite
4    1400, Long Beach, California 90802.

5       On January 25, 2021, I served the foregoing documents described as **DEFENDANTS
WILLIS RE INC. AND WILLIS TOWERS WATSON PUBLIC LIMITED COMPANY'S
6    NOTICE TO THE CLERK OF THE SUPERIOR COURT OF THE FILING OF REMOVAL
AND REMOVAL OF ACTION TO FEDERAL COURT** on the parties in this action by placing a
7    true copy thereof enclosed in a sealed envelope addressed as follows:

8    | Nicholas P. Forestiere, Esq. | Attorneys for Plaintiffs, |
9    John A. Mason. Esq. | PAUL HERRIOTT, an individual and
Candace H. Shirley, Esq. | California resident, and TIGERRISK
10   GURNEE, MASON RUSHFORD | PARTNERS LLC, a Delaware limited
BONOTTO & FORESTIERE LLP | liability company
11   2240 Douglas Boulevard, Suite 150
Roseville, CA 95661
12   Tel: {916) 797-3100  Fax: (916) 797-3131
Email:  nicholas@gurneelaw.com
13          CShirley@gurneelaw.com

14   Bryant D. Tchida, Esq. | Attorneys for Plaintiffs,
Matthew P. Kostolnik, Esq | PAUL HERRIOTT, an individual and
15   Megan J. Renslow, Esq. | California resident, and TIGERRISK
MOSS & BARNETT | PARTNERS LLC, a Delaware limited
16   150 South Fifth Street, Suite 1200 | liability company
Minneapolis, MN 55402
17   Tel: {612) 877-5284  Fax: (612) 877-5999
Email: Bryant.Tchida@lawmoss.com
18          Matt.Kostolnik@lawmoss.com
Megan.Renslow@lawmoss.com
19

20       ☑       **E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an
agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents
21   to be sent to the above-named persons at the e-mail addresses exhibited therewith. I did not receive,
within a reasonable time after the transmission, any electronic message or other indication that the
22   transmission was unsuccessful.

23       Executed on January 25, 2021 at Long Beach, California.

24       I declare under penalty of perjury under the laws of the State of California and United States of
America that the foregoing is true and correct.

25       I declare that I am employed in the office of a member of the bar of this Court at whose
direction the service was made.

26

27   _____
     TAMMY WADE

28

Proof of Service
KYL4811-3120-6361.1

Case Name:    *Herriott, et al.  v. Willis, et al.*
Case No.:     3:21-cv-588
KYL File No.: 6189-125

1

**PROOF OF SERVICE**

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3

     I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and
not a party to the within action; my business address is Keesal, Young & Logan, 400 Oceangate, Suite

4

1400, Long Beach, California  90802.

5

     On January 25, 2021, I served the foregoing documents described as **NOTICE OF FILING
OF REMOVAL OF ACTION PURSUANT TO 28 U.S.C. §§ 1332, 1441(A), AND 1446**

6

**[DIVERSITY JURISDICTION]** on the parties in this action by placing a true copy thereof enclosed
in a sealed envelope addressed as follows:

7

8

Nicholas P. Forestiere, Esq.              Attorneys for Plaintiffs,
John A. Mason. Esq.                       PAUL HERRIOTT, an individual and

9

Candace H. Shirley, Esq.                  California resident, and TIGERRISK
GURNEE, MASON RUSHFORD                    PARTNERS LLC, a Delaware limited

10

BONOTTO & FORESTIERE LLP                  liability company
2240 Douglas Boulevard, Suite 150

11

Roseville, CA 95661
Tel: {916) 797-3100   Fax: (916) 797-3131

12

Email:  nicholas@gurneelaw.com

13

         CShirley@gurneelaw.com

14

Bryant D. Tchida, Esq.                    Attorneys for Plaintiffs,

15

Matthew P. Kostolnik, Esq                 PAUL HERRIOTT, an individual and
Megan J. Renslow, Esq.                    California resident, and TIGERRISK

16

MOSS & BARNETT                            PARTNERS LLC, a Delaware limited
150 South Fifth Street, Suite 1200        liability company

17

Minneapolis, MN 55402
Tel: {612) 877-5284   Fax: (612) 877-5999

18

Email: Bryant.Tchida@lawmoss.com

19

       Matt.Kostolnik@lawmoss.com
       Megan.Renslow@lawmoss.com

20

21

     ☑     E-MAIL OR ELECTRONIC TRANSMISSION:  Based on a court order or an

22

agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents
to be sent to the above-named persons at the e-mail addresses exhibited therewith.  I did not receive,
within a reasonable time after the transmission, any electronic message or other indication that the

23

transmission was unsuccessful.

24

     Executed on January 25, 2021 at Long Beach, California.

25

     I declare under penalty of perjury under the laws of the State of California and United States of

26

America that the foregoing is true and correct.

27

28

- 1 -

Proof of Service
KYL4811-3120-6361.1

Case Name: *Herriott, et al. v. Willis, et al.*
Case No.: 3:21-cv-588
KYL File No.: 6189-125

1

      I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

2

3

4

_____
TAMMY WADE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Proof of Service
KYL4811-3120-6361.1